# WHEELING.

## VINAL, SPECIAL RECEIVER, v. GILMAN.

Submitted June 20, 1882—Decided March 24, 1883.

(*WOODS, JUDGE, Absent.)

1. A book of original entry, in which an entry is made in the usual course of business at the time of the transaction of matters within the personal knowledge of the book-keeper, may be used as evidence on the trial of a suit, if the book-keeper be dead at the time of the trial or a non-resident of the State, or if he be unable to be produced as a witness because of any other reason, as for instance insanity. (p. 309.)

2. But if the book-keeper be living and the court is able to enforce his attendance, the book cannot be used as evidence, unless his testimony as a witness also accompanies its production. (p. 312.)

3. Such book is received as evidence not only from the necessity of the case, but also because it is a part of the res gestae and general convenience compels its admittance, and hence it should be admitted without the book-keeper being examined as a witness, whenever the court can not compel this attendance, as when he is a non-resident. (p. 311.)

4. If the book itself be in the possession of a person, who is a non-resident of the State, so that its production can not be compelled by the court, a copy of any such entry in it as answers

*Case submitted before Judge W. took his seat on the bench.

the above description may be used as secondary evidence when it is proven, that it has been examined by a witness and compared with the original entry, and proven to be an exact copy. (p. 314.)

5. Such an entry in such a book stands on essentially distinct ground from a mere private entry of a person; such private entry *itself* never being evidence, though it may be used by a witness to refresh his memory. (p. 309 )

Writ of error and *supersedeas* to a judgment of the circuit court of the county of Wood, rendered on the 24th day of May, 1881, in an action at law in said court then pending, wherein John F. Vinal, special receiver, was plaintiff, and J. C. Gilman was defendant, allowed upon the petition of said Gilman.

Hon. James M. Jackson, judge of the fifth judicial circuit rendered the judgment complained of.

GREEN, JUDGE, furnishes the following statement of the case:

In 1879 John F. Vinal, receiver of the court in a certain case, brought an action of *assumpsit* against I. C. Gilman in the circuit court of Wood county for the use of various items of personal property, which were in charge of said receiver. The declaration contained all the usual common counts, and with it was filed a bill of particulars, which had among the items of charge three items, with reference to which certain evidence was received and permitted to be given to the jury against the objection of the defendant; and as the only question in controversy before this Court is the question, whether this evidence in reference to these three items should have been permitted to go to the jury, I shall state only so much of the case as will fully show, what are the merits of the controversy in this Court.

These three items are thus stated in the bill of particulars: "May 3, 1879, to the use of one one thousand barrel tank No. 2, from January 15, 1872, eight hundred dollars;" "May 3, 1879, to the use of one eight hundred barrel tank from January 15, 1872, six hundred and forty dollars," and "May 3, 1879, to the use of one engine and boiler from Banner well from January 15, 1872, five hundred dollars." Pleas

of *non-assumpsit* and the statute of limitations were filed and replied to generally and the issues joined, and on May 15, 1881, the jury found a verdict for the plaintiff for one thousand and five hundred dollars, and on May 24, 1881, the court overruled the motion of the defendant for a new trial and rendered judgment against him pursuant to this verdict.

One bill of exceptions was taken by the defendant during the progress of this trial, from which we learn, that the evidence of the plaintiff tended to prove, that the defendant, Gilman, used certain property which was in the charge of the plaintiff, as such receiver, and received the rents of it, and that of the property so used by the defendant, Gilman, were the items of personal property above named in these three items of the bill of particulars above copied, and gave proof also of the value of the use of this property for the time it was used by Gilman, while it was in the charge of the plaintiff as receiver. The defendant's evidence tended to contradict this in part at least, and on the evidence produced on each side as to the property named in these three items of the bill of particulars, the rights of the parties depended and turned upon whether the property named in these three items was or was not turned over on January 15, 1872, by Gilman and Shakely to B. G. Compton, agent for the West Virginia Oil and Oil Land Company. And in reference to this question this bill of exception proceeds as follows :

"The said defendant, further to maintain and prove the issues upon his part, offered his own testimony to prove that some time in the summer of 1871 he was directed by Frank A. Boyd, one of the firm of Wood & Boyd, in the chancery cause aforesaid, to turn over to B. S. Compton, as president of the said West Virginia Oil and Oil Land Company, the said lease and all the property thereon (which statement was contradicted by the said Frank A. Boyd in his testimony), and also gave evidence tending to show that in pursuance of said direction said defendant testified that he and Shakely had surrendered the said lease and turned over the property thereon save and excepting the one thousand barrel tank, the eight hundred barrel tank and the boiler at the Banner well mentioned in said plaintiff's account filed with his declaration in this cause, to the West Virginia Oil and Oil Land

Company, the same being received by one B. G. Compton, an agent thereof, which, as to said exceptions and reservation of said tanks and boiler at the Banner well was denied by said Shakely. And said defendant also gave evidence tending to prove that the said one thousand and eight hundred barrel tanks and the boiler at the Banner well were not turned over to said company, because the said defendant claimed that he had become the owner thereof by purchasing the same at sales made for taxes assessed against the property of said Wood & Boyd whilst he was in charge of the same.

"And the said defendant offered evidence tending to prove that at the time of turning over said property to B. G. Compton, agent as aforesaid, schedule in writing thereof was made, signed by said Gilman & Shakely, and delivered to said B. G. Compton as such agent. And the defendant having also offered and given evidence tending to prove that after said time the schedule was in possession of the West Virginia Oil and Oil Land Company, and had been lost or mislaid, the court permitted the defendant to testify before the jury as to the contents of said schedule, the said defendant giving his own testimony to prove that the said schedule contained a statement by items of all the personal property upon said lease except the one thousand and eight hundred barrel oil tanks and the boiler at the Banner well as above mentioned. And it being a fact in dispute, and material to the issue in this cause whether or not the said one thousand and eight hundred barrel oil tanks and boiler at the Banner well were turned over in fact to said West Virginia Oil and Oil Land Company, the plaintiff, in order to rebut the secondary evidence aforesaid offered by the defendant in reference to the number of tanks and kinds of property that were so alleged to have been turned over to said company, was called as a witness and testified as follows:

"'I know B. G. Compton, and also know his hand-writing. He is now and has been for some time a non-resident of this State. The signature to the writing which I here produce dated January 15, 1872, of 'B. G. Compton, late agent of West Virginia Oil and Oil Land Company,' is his genuine signature. He copied it from his book of original entries. I did not see the original schedules signed by Gilman &

Shakely of the said property turned over by them to said B. G. Compton, as agent of the West Virginia Oil and Oil Land Company, and do not know of my own knowledge what property was so turned over. This paper was taken from a memorandum book which B. G. Compton had in his possession containing the list and inventory made at the time of the transaction of property which the defendant and Shakely were alleged to have turned over to said company, and which memorandum book I saw at the time this paper was copied therefrom, and which list as kept by said Compton in said book I read, and I know this to be an exact copy of the original list of said property 'as kept in said book.' "

"And thereupon the plaintiff offered to read in connection with his testimony said paper writing to the jury as secondary evidence of the list of property so turned over to said company as aforesaid. To the reading of which paper writing the defendant, by his counsel, objected, and said objection being argued by counsel and considered by the court, was overruled. And the court permitted said paper writing to be read in evidence to and considered by the jury in connection with the testimony of the plaintiff, the same being in the words and figures following, to-wit:

"Invoice of property turned over by Gilman & Shakely:

"INVOICE.

     [Copy.]          "Jan'y 15, '72.

"MEMO.—*Invoise* of Wood & Boyd's property turned over to W. Va. O. and O. L. Co., B. G. Compton, ag't, by Gilman & Shakely:

1 engine and boiler at Banner well.
1 engine house, rig, &c.,    "     "
1 bar round iron, $\frac{1}{4}$ in. dia., Banner well.
1 50 bbl. tank, No. 1.
1 1,000 bbl. tank, No. 2.
1 800    "    "    "  3.
1 140    "    "    "  4.
1 1,300    "    "    "  5, at R. R., mouth of Lick Fork.
1 boiler at Cory well.
1 engine at Ohio State Oil Co.
334 ft. 2$\frac{1}{2}$ in. tubing at Conkle & Wilde's well.
150 ft. 1$\frac{1}{2}$ in. gas pipe at McGee well.
1 2$\frac{1}{2}$ in. wkg. bbl. at Gilman's house.
15 joints 2$\frac{1}{2}$ in. light tubing at Banner well.
406   "   2 in. tubing at Tip Top well (Union acc't.).
216   "   2 in., No. 6 well, Lick Fork.

4 ps. 2 in , No. 6 well, lead line.

1 anvil at Carl and Cuthbert's.

1 vise at Petroleum.

1 auger stem at D. M. Shakely's.

1 sinker bar on South side.

1 *pr. pr. jars jars* on South Side.

1 broad-axe, Rob't Roy well.

1 pr. 2½ in. clamps, Carl & Cuthbert.

1  " 2½  "    "    Col. Vinal.

1 2¼ in. auger, Petroleum.

3 augers at D. M. Shakely's.

1 tank, No. 6, Lick Fork, 228.

2 temper screws, one at D. M. Shakely's, one at Banner well.

1 tank at W. Va., pumping station at Lick Fork, 500 bbls.

1 bull wheel at Carl & Cuthbert's Root Hog well.

                                  "B. G. COMPTON,
            "*Late Agent of W. Va. O. & O. L. Co.*

"The court remarking to the jury that it permitted said paper-writing to be read not as conclusive but as secondary evidence in connection with other evidence in the cause, as to the fact of the kind and amount of property the said Gilman and Shakely turned over to the West Virginia Oil and Oil Land Company, the original paper concerning the same being lost; to which ruling and opinion of the court permitting said paper writing to be read in evidence to and considered by the jury for any purpose, the defendant, by his counsel, excepted, and this his bill of exceptions tendered, and prays that the same may be signed and saved to him and made part of the record in this cause, which is accordingly done."

There was no ground for asking a new trial, except the supposed error of the court in admitting this invoice as evidence. The defendant has been awarded a writ of error and *supersedeas* to the judgment of the circuit court on this verdict of the jury.

*Walter S. Sands* for plaintiff in error cited the following authorities: 2 Bish. Ev. § 483 and cases there cited; 1 Smith Lead. Cas. 510; 5 Wend. 301; 3 Barb. 120; *Id.* 528; Little Sel. Cas. 388; 6 Pick. 222; 8 East. 273; 11 Gratt. 527; 1 Greenl. Ev. § 115; 8 Wheat. 326; 15 Mass. 350; 15 Vt. 178; 4 Hill 537; 6 Cow. 162; 16 Wend. 595; 4 N. Y. 170; 1 Greenl. Ev. § 84 note; 20 Wall. 226; 1 Starkie Ev. (3d ed.)

356; 1 Greenl. Ev. §§ 124, 436, 437; 2 Saund. Pl. Ev. (part 2) 851.

*John A. Hutchinson* for defendant in error cited the following authorities:   10 Ind. 125; 1 Greenl. Ev. § 84; 3 Ohio 107; 10 B. Mon. 115; 12 Minn. 502; 8 Ia. 298; 9 Wheat. 581; 8 Port (Ala.) 546; 5 Cal. 467; 7 J. J. Marsh. 316; 4 Mete. (Ky.) 1; 1 Starkie Ev. 270; 2 East. 250; 1 Starkie N. P. 90; 6 Pet. 352; 1 Whart. Ev. §§ 130, 131, 133; *Id.* § 94 and cases cited; 2 M. and R. 433; 20 Wall. 134; 2 McCord 349; 15 Md. 523; 8 Watts 77; 1 Binn. 234; 10 Serg. & R. 155; 2 Watts & S. 137; Bank *v.* Officer 12 Serg. & R.; 18 Wall. 516; 20 Wall. 134; 41 Conn. 107; 68 Pa. St. 267; 35 Vt. 195; 21 Ohio St. 653; 22 Minn. 18; 15 Am. Dec. 195; 9 Pet. 663.

GREEN, JUDGE, announced the opinion of the Court:

The main question in dispute before the jury on the trial of this case was, "whether or not the two tanks of one thousand barrels and eight hundred barrels respectively and the boiler at the Banner well were included in the property, which was turned over by Gilman and Shakely to B. G. Compton, as the agent and manager of the West Virginia Oil and Oil Land Company.   The defendant Gilman insisting, that these items of property were not in point of fact so turned over, and the plaintiff insisting, that they were.   To prove that they were not the defendant, Gilman, offered evidence tending to prove, that at the time of the turning over of said property to B. G. Compton, as agent of said company, a schedule in writing of the property was made out and signed by Gilman and Shakely and delivered to Compton as such agent, and that it had been lost and the defendant, Gilman, proved the contents of this paper stating, that these two tanks and boiler were not in this schedule of the property, which was signed by Gilman and Shakely.

The plaintiff himself then testified, that Compton was and for some time past had been a non-resident of the State; that he had procured a statement from Compton of the invoice of the property, which was so turned over by Gilman and Shakely to him as agent of said company, which invoice

was produced and shown to the jury, and on it was mentioned these two tanks and this boiler of the Banner well; that this invoice thus produced was taken from a book, which Compton had in his possession containing the inventory made at the time this property was so turned over, and that the witness saw this invoice on said book and knew that the invoice produced and shown to the jury, was an exact copy of the original list of said property as kept in this book.

The defendant, Gilman, objected then to the reading of this invoice to the jury, but the court permitted it to be read, and the only question presented by the record for our decision in this case is, did the court err in thus permitting this invoice to be read.

To determine this question, we must determine the character of this entry in this book made by Compton of this invoice. Was it an original entry or was it a copy of the inventory of this property, which had been signed by Gilman and Shakely when they turned over this property to Compton, as the agent of said company?' This, it seems to me, is satisfactorily answered by the paper itself, which was produced. It commences: "Invoice of Woods & Boyd's property turned over to West Virginia Oil and Oil Land Company, B. G. Compton agent, by Gilman and Shakely." Then follows a simple list of the property not signed at all. This paper is on its face not a copy of the schedule signed by Gilman and Shakely and handed over by them to B. G. Compton, and it does not profess to be a copy of such a paper. It professes to be an original invoice of this property made out it is proven, in the handwriting of Compton, and as he had the possession and control of this property, it must be regarded as having been made out from inspection of the property, as other invoices are made out; he being the agent and clerk of this company and having the charge and control of this property, it was obviously in his line of duty as such agent to make out in a book, in which the other property of this company in his charge was listed, a list of this property which then for the first time came under his charge as the agent of the company; and it is presumed, that this was an entry in this book in the regular and proper discharge of his duty as such agent. It was not only not a copy of the paper,

which Gilman and Shakely had signed, but it was not even a private memorandum of B. G. Gilman; it was a regular business entry made by him as agent of the West Virginia Oil and Oil Land Company, in the regular transaction of business at the time the transactions occurred, which is recorded in such entry. Such an entry stands on a very different footing from a private memorandum or entry, which has been made by a witness of any transaction. Though the party who made such private memorandum or entry be dead, it can never be used as evidence; and under no circumstances is such private memorandum or entry held to be in *itself* evidence.

But when the witness is living, it may be examined by him to refresh his memory though it is never *itself* evidence, which can be submitted to the jury to prove the facts recorded in such memorandum. When it is permitted to be examined and read by the witness, still it is the statement of the witness and not the private memorandum or entry, which is the evidence. See *Kensington* v. *Inglis et al.*, 8 East. 274; *Harrison* v. *Middleton*, 11 Gratt. 544; *O'Neale* v. *Walton*, 1 Rich. 234; *Sasseer* v. *The Farmers Bank*, 4 Md. 418; *Maungham* v. *Hubbard & Robinson*, 8 Barn. & Cres. 14. It is otherwise when the memorandum or entry is not a private one, but is one made in the usual course of business by a clerk or agent. For such memorandum or entry is held to be admissible as evidence, after the death of such clerk or agent, on proof of his hand-writing even though the entry *be not contrary to the interest* of the party who made the memorandum or entry.

It is sufficient, that the entry was made at the time of the occurrence in the usual course of business, to make it evidence on proof of the hand-writing of the party who made it, and that he is dead. See *Doe* v. *Turford*, 3 B. & Ad. 890; *Price* v. *The Earl of Torrington*, 1 Salkel 285, and notes thereon in Smith Leading Cas. vol. 1, side page 390; *Lewis* v. *Norton*, 1 Wash. 76; *Welsh* v. *Barrett*, 15 Mass. 380. And when the party is living, who made such an entry in the regular course of business, though he remembers and can testify nothing about the facts recorded in the entry, but simply testifies that he made the entry in the usual course of

business at the time of the transaction, such entry is of *itself* primary evidence of the facts recorded, though the witness be living and testifies in court if he knows, that he made the entry in the regular course of business. See *Spann* v. *Baltzell*, 1 Fla. 302-321; *Farmers & Mechanics Bank* v. *Boraef* 1 Rawle 152; *Bank of Monroe* v. *Culver*, 2 Hill N. Y. 532.

Upon these and other authorities I think it is clear, that if B. G. Compton had been dead, this memorandum book kept by him as the agent and manager of the West Virginia Oil and Oil Land Company, could have been produced and on the proof of his hand writing, this invoice and entry could have been read as evidence to the jury to prove the facts recorded in this entry.

The next enquiry is, whether the fact that B. G. Compton was a non-resident of this State, and could not therefore be compelled by the plaintiff to attend at the trial as a witness, would when proven, have justified the introduction of the invoice and entry as though he were dead. It has in many cases been held by courts—or intimated by *dicta* of Judges, that under such circumstances the book so kept and the entry in it, may be produced in court and submitted to the jury as evidence of the facts recorded in the entry, on the proof of the hand writing of the book-keeper, though he be not dead, if he resides and is out of the State. *Elms* v. *Chevis*, 2 McCord (S. C.) 349; *Trim.* v. *Rogers*, 1 Bay 480; *Reynold's adm'r of Alex. Paul* v. *Manning, Stimpson & Co.*, 15 Md. 523, 524; *Alter* v. *Berghans*, 8 Watts 77; *Crouse et al.* v. *Miller*, 10 Serg. & Rawle 158; *Chaffee & Co.* v. *United States*, 18 Wallace 541; *Cummings* v. *Fullum*, 13 Vt. 434; *Cummings & Manning* v. *Fallum*, 13 Vt. 440; *Burton* v. *Driggs*, 20 Wallace 134; *Bartholemew* v. *Farwell*, 41 Con. 107.

It has been held, that the temporary absence from the State of the party who made the entry, though he was a resident of the State, would justify the reading of the entries from the book if the hand-writing of the book-keeper was proven. See *Hay* v. *Kramer*, 2 Watts and Serg. 138; and in *Holbrook* v. *Gay*, 6 Cush. 215, it was held that such entries could be read if the book-keeper was insane. See also, *Chaffee* v. *United States*, 18 Wal. 541, and *Union Bank* v. *Knapp*, 3 Pick 96. But, there are decisions of courts or

*obiter dicta* of Judges to the contrary and which hold, that if the book-keeper be not dead but only absent from the State, whether as a non-resident or temporarily, the entries in a book can never be read as evidence when he is not produced as a witness at the trial or when his deposition has not been taken. See *Cooper* v. *Marsden*, Esp. 1; *Welsh* v. *Barrit*, 15 Mass. 380 (top page 306); *Merrill* v. *The Ithaca & Oswego Rail Road Co.*, 16 Wend. 600; *Brewster* v. *Doane et al.*, 2 Hill 537; *County of Mahaska* v. *Ingalls*, 16 Ia. 95; *Monroe* v. *Andrews & Brothers*, 5 Porter (Ala.) 107.

These cases proceed upon the basis, that the rule, which permits the introduction of entries as evidence in any case, is based only on the *necessity* of permitting it, in order that the ends of justice may not be defeated and when it is impossible in the nature of the case to produce better proof, as when the person, who kept the book and made the entries in the regular course of business, is dead; but that, when he is living, it is necessary to produce him or take his deposition in all cases, because it would be dangerous to dispense with his evidence and might lead to frauds, when there could be no responsibility for false entries, which then would be, if they were testified to by him on oath, as his testimony would then be given under the liability of being punished, if he should commit perjury; and that it would therefore be unsafe to admit books as evidence in any case where it could possibly be avoided, unless the parties had the opportunity of examining the book-keeper on oath.

There is considerable force in this reasoning, and certainly the rule permitting books to be used as evidence should be carefully confined within proper limits. But it is not true, that the allowing of original entries in books, made at the time the transaction occurred in the usual and regular course of business by a party having personal knowledge of the transaction recorded, is permitted only from *necessity;* on the contrary other and very strong reasons are given for the admission of such entries as evidence; first, they are a part of the *res gestae;* secondly, general convenience is much promoted by their admissions as evidence. These reasons would lead to the conclusion, that such entries as above described, being proven to possess all these qualities, might properly be

admitted as evidence, whether the person who made them is produced in court or not, or whether his absence be accounted for or not, especially if it were proven, that his books were generally correctly kept. These entries are a part of the *res gestae* whether he be present at the trial or not, and the general rule is, that all the *res gestae* may and should be proven to promote the ends of justice. All the requisites of such an entry, which we have specified above, may be proven by others to exist as well as by the book-keeper. Others may prove the entry to have been an original entry, made at the time and in the regular course of business by one acquainted with the transaction recorded in the entry. Surely such an entry, as a part of these *res gestae*, is in itself valuable evidence in our search for truth, even when unaided by the evidence of the book-keeper; and it is regarded by the courts, as the decisions show, as legitimate evidence, though the book-keeper in no manner supports it by his testimony, as when he testifies he has no recollection of the facts which are recorded in the entry, and only testifies to its having been made by him under the circumstances we have pointed out. This could of course have been proved by others.

It would, it seems to me, be going too far to admit such entries as evidence when the book-keeper was living within the jurisdiction of the court, and no sufficient reason such as insanity or some other, was shown to them why he was not produced as a witness. For if it were allowed, such book-keeper might be purposely kept from being at the trial, the parties wanting to use the entries in the book knowing or believing that his testimony in connection with such entries would weaken his case. To prevent such conduct, which approximate to fraud, the courts have uniformly required the testimony of the book-keeper to accompany the production of the entries in such book as evidence, whenever the book-keeper was within the jurisdiction of the court, that is, within the State, and no sufficient reason is shown why he does not testify in connection with such entries.

I am not prepared to say that the temporary absence of the book-keeper from the State ought to dispense with the receipts of his being produced, though there is some authority therefor. It seems to me, however, that as this temporary

absence may be readily brought about for the very object of obtaining the advantage of using such entries, without the accompanying statement and explanation of the book-keeper, it would be probably unwise to relax the rule so far as to dispense with the presence of the witness when he was only temporarily absent from the State, especially as the alternative of a temporary continuance of the cause till his return to the State, might be but a small inconvenience.

If the party is a non-resident of the State and permanently absent from it, the case is far different, for in such case no suspicion can exist as to his being kept away for the purpose of obtaining an unfair advantage; his absence being shown to arise from his permanent non-residence. When this is the case, I can see no reason for requiring his deposition to be taken, before such an entry as I have described, can be used as evidence.

In a large majority of cases, his evidence would neither add to nor detract from the value of the entry as evidence *itself*; and the obtaining of his deposition in connection with the entry, that is with the original book of entries before him, as it would have to be to make his testimony of any value, would be often very costly and inconvenient and sometimes almost impossible, as when the book containing the entries was still being used as an account book. And if the book-keeper chose to do so, he would have it in his power to prevent the entries made by him from being used at all, no matter how essential their use was to the ends of justice. For in this State, and I presume in most if not in all of the States, the law provides no mode of compelling a witness to give his deposition in a suit pending in another State or in a foreign country. If the witness be in this State, the court may compel his attendance or may compel him to give his evidence, but if he be residing out of the State the court cannot compel him to testify, and for this reason if for none other, the original book of entries containing all the requirements I have specified, ought to be allowed to be used though the book-keeper's deposition has not been taken and he is not presumably present as a witness, when he is a non-resident of this State. This conclusion is sustained by the weight of authority, though we have seen that there is con-

siderable conflict among the cases. For a review of these authorities we note two. *Union Bank* v. *Knapp*, 3 Pick. 96, in American Decision Vol. 15 p. 192, 193 and 194.

Of course if the original book containing such entry is in the possession of any person, who is a resident in the State, its production should be required, as it could be compelled by the court, but if this book be in the possession of one not residing in the State, its production could not be compelled by the court, and in such a case on general principles, a copy taken from the original book, compared with the original entry and proven by a witness on the trial, is "the very best secondary evidence that can be obtained in the nature of the case, and should therefore be received as evidence; nor is it necessary in such case to prove, that any special efforts have been made to induce the person, who has the original book in his custody and who lives out of the State, to produce it at the trial. In most cases all such efforts would be failures, and as their success would not depend on the action of the party offering to introduce such entries as evidence, he is under no obligation to prove that he has made an effort to get the original book of entries."

In the case before us it is claimed, that it was not proven that this entry had all the requisites, which the law requires in order to make it evidence in itself. The first requisites is, that book must be a book of original entries. The court certifies that it was proven, that this invoice of property turned over by Gilman and Shakely, was copied from B. G. Compton's book of original entries, which was a memorandum book *kept* by B. G. Compton, the agent of the West Virginia Oil and Oil Land Company, and that it contained this list and inventory made at the time when the property was turned over by Gilman and Shakely to said company. The second requisite is that the entry should be made when the transaction occurred. It bears date on the book as of the time, at which the transaction took place; the witness says, that it was made at that time, and there is no room to doubt that this was a fact. The third requisite is, that the entry must be made in the regular course of one's business, duty or employment. The bill of exception shows, that it was proven that this property thus listed in this book kept by B. G.

Compton, was turned over to him by Gilman and Shakely, he receiving it as the agent of the West Virginia Oil and Oil Land Company, as stated on the face of this book. Obviously, this book containing a list of all the property of this company in his charge, was kept not for his private use, but as a book of the company; and assuredly these entries, from their very nature and from the relations which B. G. Compton held to said company, were business entries made by him as a 'part of his regular business, whereby he admitted and charged himself with having this property so listed in his custody, as the agent of said company. The last requisite is, personal knowledge of the transactions on the part of the one making the entry. This entry is proven to have been made by B. G. Compton, it being in his hand-writing and he being the person, as was proven, to whom this property was turned over by Gilman and Shakely; he of course knew this fact when it was done and what property was so turned over, and these are all the facts appearing by this entry.

This entry thus being one which was in itself evidence, and the original book of entry being, when it was last seen, in the hands of B. G. Compton a non-resident of this State, the presumption is of course, that it was still in his hands and therefore the copy produced of this entry, which had been compared with the original entry by the witness, who testified that it was an exact copy, was properly permitted to go to the jury as evidence. The only ground on which a new trial was asked for was, that the court erred in permitting the copy of this entry to go to the jury as evidence, and there being no error in his so doing, the motion for the new trial was properly overruled, and judgment entered against the defendant in accordance with the verdict of the jury.

The judgment of the circuit court of Wood county rendered May 24, 1881, must be affirmed; and the defendant in error John F. Vinal, special receiver, must recover of the plaintiff in error, J. C. Gilman, his costs about his defense in this Court expended and damages according to law, and the same must be certified to the clerk of the circuit court of Wood county.

JUDGES JOHNSON AND GREEN CONCURRED.

JUDGMENT AFFIRMED.