# CHARLESTON.

## H. M. BOURN v. S. F. & V. B. DOBBINS.

Submitted October 24, 1922.       Decided November 14, 1922.

1. EVIDENCE—*Secondary Evidence Admissible on Showing That Letters Were in Possession of Non-resident, and That Plaintiff Offering Them Did Not Control Them.*

    Where plaintiff shows that certain letters are material on the trial of a case; that they are in the possession of a person who is a non-resident of this state, so that their production can not be compelled by the court, and plaintiff has no control over them; evidence of their contents is admissible. (p. 269).

2. PRINCIPAL AND AGENT—*Unauthorized Contract May be Ratified by Principal.*

    The unauthorized contract made by an agent may be ratified by his principal. (p. 270).

3. CORPORATIONS—*Acceptance of Benefits of Contract Made by Agent Without Authority Ratification of Agent's Acts, Precluding Corporation from Denying Validity of Contract for Lack of Authority of Agent.*

    And where the agent of a corporation, without authority, makes a contract of sale of growing trees belonging to it, in consideration that the purchaser permit it to use certain lands under his control for a tramway, and the corporation, with full knowledge, accepts the benefits of the contract and makes use of the right of way, it thereby ratifies the acts of the agent and will not thereafter be permitted to deny the validity of the contract for lack of authority in the agent to make it. (p. 270).

4. FRAUDS, STATUTE OF—*Growing Trees Part of Realty; Contract for Sale of Growing Trees Revocable; Trees Become Personalty on Severance From Land and Belong to Purchaser Under Executed Oral Contract of Sale.*

    Growing trees on land are a part of the realty, and an oral sale thereof is revocable; but if the contract be executed by

92 W. Va.

severance, the trees become personalty and belong to the purchaser, with right of removal.  (p. 271).

5.  SAME—*Where Oral Contract for Sale of Growing Trees Has Become Executed, Purchaser has Title to Severed Trees, and May Enter Upon Land and Remove Them.*

A corporation makes an oral sale of certain growing locust trees on its land, in consideration that the purchaser permit it to use certain lands under his control as a right of way for a tram-road; the corporation uses the right of way until it has finished its work and permits the purchaser to enter upon its lands, to cut the locust trees and to haul a portion thereof away.  The contract has become executed; and the purchaser, though the contract has thereafter been revoked by the corporation, has title to the severed trees and the right to enter and remove them.  (p. 270).

Error to Circuit Court, Braxton County.

Action by H. M. Bourn against S. F. Dobbins and another. Judgment for defendant, and plaintiff brings error.

*Reversed and rendered.*

*Hines & Kelly* and *Hall Bros.,* for plaintiff in error.

*Haymond & Fox,* for defendant in error.

MEREDITH, JUDGE:

This is an action of detinue instituted on April 1, 1918, before Justice C. B. Eakle, for the recovery of certain locust logs or poles.  Plaintiff gave bond and took possession of the logs.  The justice rendered judgment in favor of the defendants.  Plaintiff appealed to the circuit court.  Defendants pleaded non-detinet and the statute of limitations. After both parties had introduced their evidence, defendants demurred to plaintiff's evidence.  Plaintiff joined therein.  The jury returned the following verdict:

"If the law be for the plaintiff upon the demurrer to the evidence, then we, the jury find for the plaintiff; but if the law be for the defendant, then we, the jury, find for the defendant.

We further find that of the one hundred poles in the summons mentioned, ninety three are in the posses-

sion of the plaintiff and that they are of the average value of $1.50, and of the aggregate value of $139.50.''

The court sustained defendant's demurrer, adjudged that the plaintiff take nothing and that defendants recover from plaintiff the 93 poles in the summons and verdict mentioned, if recovery thereof can be had, and if not, then that they recover from the plaintiff and his sureties the sum of $139.50 and costs. Plaintiff prosecutes this writ of error.

The facts appear substantially as follows: On July 11, 1906, Louis Bennett and others, by deed, conveyed to Interstate Cooperage Company, a corporation, all the merchantable timber on a large boundary of land in Braxton, Gilmer and Calhoun Counties, with rights of way over the lands to remove the timber until January 1, 1925. The deed further provided that the timber on at least 2000 acres of the land should be removed by July 1, 1909, and each year thereafter the timber from at least 1500 acres should be removed. The areas so cut over were to be surveyed and the timber then remaining on said parcels was yearly from January 1, 1909, to be surrendered back to the grantors, their heirs or assigns, by metes and bounds, and then to be as though it had never been sold by them.

The Cooperage Company cut considerable timber from the lands between the date of the deed and October 4, 1913; on that date it released and surrendered back to its grantors all the remaining timber on certain lands in Braxton County, reserving, however, its rights of way or other easements vested in it by its deed from them.

Some time in 1908, the Cooperage Company needed a right of way for a tram road over the lands of plaintiff's wife, so that it could haul part of the timber from the Bennett lands. It had its principal office at Cleveland, Ohio, but maintained its local office at Gassaway, Braxton County. B. H. Rawson was its superintendent in charge of its West Virginia operations and had charge of its local office. Martin Snyder was president of the Company and had his office in Cleveland. Rawson made an oral agreement on behalf

of his company with the plaintiff that if the company were permitted to build and operate its tramroad over the lands belonging to plaintiff's wife that plaintiff could cut and remove the locust timber located on certain of the Bennett lands, which the company had under the Bennett deed. This contract was not then reduced to writing. The company built and operated the tramroad as planned over the lands belonging to Mrs. Bourn, and plaintiff began cutting and removing the locust timber from the areas agreed upon. The tramroad was operated for at least a year or more, and apparently as long as the company desired. Plaintiff continued cutting locust timber until at least 1911, and possibly as late as 1912. He cut this locust timber from three tracts, the Dobbins tract, Hamric tract, and Steele tract; also possibly from other tracts, but these three are the only ones mentioned specifically in the record. He did not haul the locust timber off as it was cut, but hauled it as he had need or as his time would permit. But he continued to haul and remove some of the cut poles and logs, each year up to and including the year 1916. It appears that he hauled the logs from one tract or the other, as occasion or convenience might require, to the ways or roads nearest home or the points where he desired to load them, but at the time of the institution of this action there were on the Dobbins tract 93 poles; on the Hamric tract 48 poles; and on the Steele tract 42 poles. Some of the 93 poles on the Dobbins tract were not cut on that tract but from other tracts.

On July 13, 1917, Louis Bennett and others, owners in fee, conveyed to defendants, S. F. Dobbins and Van B. Dobbins, a tract of 87 acres and 48 poles; this is the Dobbins tract heretofore referred to. There was reserved in this deed all the coal, oil, gas and other minerals, with the right to remove the same, and with the further provision that the sale and conveyance was made subject to the rights, privileges and easement that the Interstate Cooperage Company, its successors and assigns, might have to and upon the land and the timber thereon.

Some time after defendants acquired their land, plain-

tiff started to haul away the 93 poles located on their tract, and defendants stopped him. This action followed.

The main point in controversy is whether a binding contract was made between plaintiff and the Interstate Cooperage Company whereby he was given the right to cut and remove the locust timber from the lands. The poles were cut before the Cooperage Company surrendered the lands back to Bennett. It retained rights of way over the lands, and Bennett's deed to defendants was made subject to the rights, privileges and easements that the Interstate Cooperage Company, its successors and assigns, might have to and upon the land and the timber thereon.

It is argued by counsel for defendants: (a) that the record contains no competent evidence showing that any of the local officers of the company had any authority to sell plaintiff the locust timber, or to permit him to remove it; (b) that any attempted sale of the timber, being a sale of real estate, is controlled by the statute of frauds, and because no writing evidencing such sale was produced no title to the timber passed to plaintiff; and (c) that under the deeds the title to timber on the lands, standing and several passed to the defendants, and therefore plaintiff can not recover.

Let us examine the evidence. Rawson testifies that he was superintendent of the Company from 1905 to 1910 and during that time looked after its timber interests in West Virginia; that he sold plaintiff the locust timber from this and the other tracts mentioned in consideration of the right of way for the tramroad and for rolling the company's stave timber from the Bennett land across the Bourn land; that that is all that the company paid for the right of way. He states positively that he was authorized to make this deal or to sell the locust timber to the plaintiff; that Martin Snyder, president of the company, gave him this authority by two letters in 1908. He says that after he made the arrangement with plaintiff in regard to the right of way for the tramroad and right to roll the timber through the Bourn land from the Bennett land, he wrote to the president of the company

about it, detailing to him the arrangement. President Snyder wrote back and wanted to know how much locust timber there was on the land that Bourn was to cut over. Rawson answered, giving him the information. Snyder wrote again and told him to close the deal with Bourn and he did so. He further testifies that he was succeeded as superintendent by George Martin. This was about 1910. Soon afterward a controversy arose between Bourn and the company in regard to the locust timber; just what it was is not clear, but probably Martin then knew nothing about the prior arrangement. Rawson was called in and explained matters to John Zaring, bookkeeper in the company's office at Gassaway, and to Mr. Martin. Martin contended then, as Rawson says, that the locust timber had never been sold to Bourn. Rawson went to the Gassaway office, secured from the files the copies of the letters he had written to Snyder about the transaction and the original letters he had received from him, and he states that Martin and Zaring then agreed that Bourn should go ahead and take the timber off the land. As to this conference between him, Rawson, and Martin, he is corroborated by Zaring, who was employed there from 1907 to 1912. He also testifies in general terms about the letters. Martin, a witness for defendant, denies there was any such adjustment or that there was any such correspondence. He does admit, however, that while he was acting as superintendent, he required plaintiff to remove some of this locust timber from a parcel of the Bennett land on which the company desired to locate a mill. We think it also clearly appears that the company knew plaintiff was cutting and removing the locust timber as the work was carried on. It cut and removed its timber while plaintiff was cutting and hauling; it made no objection till Martin became superintendent; that objection was removed.

The letters were not and could not be produced. The company had removed its office from West Virginia; its main office was removed to New York City, and it maintains an office in Kentucky. Plaintiff, showing every mark of good faith, testifies that he wrote many letters to the officers of the company asking them to search for and produce these letters

and they replied a number of times, stating they had searched in vain for them, and finally in reply to one of his letters, they stated they could not find them and would search no more. The evidence of Rawson as to his making the sale of the locust timber to Bourn, his authority for doing so, and the contents of the letters was not allowed to go to the jury; likewise the evidence of Zaring. Doubtless the court did so on the theory that loss or non-production of the letters was not satisfactorily accounted for. In this the court was in error. It is shown that, if they were in existence, they were not in the state, and that plaintiff had made every reasonable effort to locate them without the state and had failed. Under such circumstances, evidence of the contents of the letters was admissible. It was held in *Vinal* v. *Gilman*, 21 W. Va. 301, that if a book is in the possession of a non-resident, so that its production can not be compelled by the court, a copy of any of its entries if otherwise proper, may be used as secondary evidence when it is proved that it has been examined by a witness and compared with the original entry and proved to be an exact copy. To the same effect is *Edgell* v. *Conaway*, 24 W. Va. 747, in which case the court says: ''If the original is shown to be in the possession of a non-resident of the State, evidence of its contents or a copy may be produced in evidence.'' And plaintiff was not required to take the deposition of the company's officers without the state or elsewhere to show that the letters were lost or to require them to produce them. A showing that they, if in existence, were in the possession of a non-resident was sufficient.

In the case of *Burton* v. *Driggs*, 20 *Wallace* (87 U. S.) 125, it was said: ''In the present case the witness lived in another state and more than one hundred miles from the place of trial. The process of the court could not reach him; for all jurisdictional purposes he was as if he were dead. It is well settled that if books or papers necessary as evidence in a court in one state be in the possession of a person living in another state, secondary evidence without further showing, may be given to prove the contents of such paper, and notice to produce them is unnecessary.''

Of course, if the witness who had possession of the document were under control of the party desiring to introduce its contents, the situation would be different; but that is not the case here. Plaintiff had no control over these letters. Some states do not follow the rule announced in *Burton* v. *Driggs, supra,* but it is one of long standing in this state. The contents of these letters were sufficiently shown and should have been admitted.

There does not seem to be any contention about Snyder's authority to sell the locust timber. It is clearly shown that he was frequently, if not always, consulted by the superintendent in charge when sales of timber were made. From the evidence, we think the president's general authority to sell the company's timber can be fairly inferred. But if that were not the case, the letters would be proper evidence to show knowledge on the part of the company of the arrangement made between plaintiff and the company's agent. But suppose we exclude these letters from our consideration, as the trial court excluded them from the consideration of the jury. We may assume that Rawson had no authority to make the contract; the record shows, however, that he did make it and the company received the benefit of it. It used the right of way over the Bourn lands with full knowledge that Bourn was cutting and hauling the locust timber under claim of right to do so. Knowledge can be imputed to the company; its local agents had notice and therefore, under the circumstances, the company had notice. This clearly appears, even though we disregard the letters. It permitted him to cut timber during a period of at least three years and to haul it away from time to time during the whole period it held the Dobbins lands. It would not under such circumstances be permitted to deny the validity of the contract, though made by its agent without its authority, without restoring the consideration it received. That it can not do. It can not hand back to Bourn the use it had of the right of way, and place him in statu quo. The poles sought in this proceeding have been severed from the realty and become personalty. *Fluharty* v. *Mills,* 49 W. Va. 446, 38 S. E. 521.

The contract became executed by severance, and the title to the severed poles became vested in the purchaser, Dr. Bourn. When he cut them he was not a trespasser; until the contract was revoked by the company he had the right to continue cutting timber. As was said by Judge Brannon in *Fluharty* v. *Mills, supra:*—

> "It is proper to say that though an oral agreement is not enforceable by action at law or suit in equity, but until executed is revocable by the parties at will, yet it is a license to enter upon the land and take the timber, and exempts the party from an action of trespass, and the moment the tree is severed from the soil it ceases to be realty, is converted into a chattel, and belongs to the purchaser."

Having title to the severed poles, it follows that he had the right to their possession.

But defendants contend that by their deed from Bennett they acquired all the timber on their land, whether it be standing or severed. This can not be, for the deed to them from Bennett is expressly made subject to the rights of the company, *its successors or assigns* in any timber then on the land. So whether or not defendants had any actual notice of plaintiff's right to the timber is not material; they bought their land subject to his rights. Bourn, having title to the severed poles, had right to their possession; this is sufficient to sustain his action. *Burns Bros.* v. *Morrison,* 36 W. Va. 423, 15 S. E. 62.

The statue of limitations was relied on in the court below. Little is said about it here. But clearly, plaintiff's claim is not barred. When did time begin to run against plaintiff? His right was not disputed until after defendants acquired their land. The Cooperage Company never denied it, nor did Bennett. Bourn continued to haul his locust logs, according to his testimony, right along until 1916. This action was brought in 1918. His claim is not barred.

For the foregoing reasons, we will reverse the judgment of the circuit court, overrule defendant's demurrer to plain-

tiff's evidence, and judgment will be entered here for the plaintiff, on the verdict.

*Reversed; Judgment for plaintiff.*