GROVER C. KELLER

*v.*

AILEEN K. WONN, *Executrix, etc.*

(No. 10698)

Submitted April 19, 1955. Decided May 24, 1955.

*Jacob S. Hyer, Milford L. Gibson,* for plaintiff in error.

*James E. Ansel, H. G. Muntzing, Robert E. Maxwell,* for defendant in error.

BROWNING, JUDGE:

This Court granted a writ of error to the judgment entered by the Circuit Court of Randolph County on April 12, 1954, in favor of the plaintiff, Grover C. Keller, in an action of trespass on the case against the defendant, Aileen K. Wonn, Executrix of the last will and testament of Roy E. Wonn, deceased. The assignments of error, fourteen, may be condensed into three main categories: (1)

The sufficiency of the evidence; (2) the admission of certain testimony in behalf of the plaintiff, over the objection of the defendant; and (3) the giving and refusal of certain instructions.

The facts as to the accident are simple, and, in the main, uncontroverted. Defendant's decedent, Roy E. Wonn, was proceeding down Davis Avenue in the City of Elkins in his automobile on October 3, 1952; he paused at a stoplight, then proceeded at approximately fifteen miles an hour for a short distance when his car veered to the right and ran onto the sidewalk, striking and severely injuring plaintiff. At the time of the collision, or within seconds afterward, Wonn was unconscious, and he died before reaching the hospital. There is testimony that previously that morning, and within minutes before the accident, Wonn had appeared to be normal and in good spirits. Death was attributed to a massive cerebral hemorrhage. The question arises as to whether the mere operation of an automobile by Wonn, in view of his physical condition and background, was sufficient to constitute negligence, and the answer, primarily, depends upon expert medical testimony.

The plaintiff offered the testimony of Drs. Goodwin, Golden and Harper. Dr. Harper examined Wonn in 1951, and testified that he was then suffering from hypertension or high blood pressure. When asked a hypothetical question relating to Wonn's previous medical history, he stated that he would expect the condition to become progressively worse, and that the cause of death, massive cerebral hemorrhage, would be expected. Dr. Goodwin, an eye, ear, nose and throat specialist, testified that he had attended Wonn at the Davis Memorial Hospital in 1940, at which time Wonn was suffering from a severe nosebleed. The physical examination at that time was performed by another physician who noted Wonn's high blood pressure. Dr. Goodwin recalled that the other physician had advised Wonn "to take it easy and be very careful in any strenuous work so he would not bring on any more of these severe nosebleeds * * *." Dr. Goodwin testified

that his diagnosis at that time, as shown by hospital records, was "hypertensive disease". Dr. Goodwin also testified that Wonn had been admitted to the Davis Memorial Hospital in 1944, at which time the attending physician, as shown by hospital records, made a final diagnosis of "arteriosclerotic heart disease". These records also show that X-rays were then made of Wonn's stomach and gall bladder, which did not reveal anything abnormal. Dr. Golden, head of the Golden Clinic, which was connected with the Davis Memorial Hospital in 1940 and 1944, testified that in normal clinical procedure, a serious case is discussed in staff conferences; that in this way he became informed of Wonn's condition; and that within seventy-two hours of Wonn's hospitalization in 1944, he advised Wonn "that he was seriously ill, that the findings were of a progressive nature, and he could shorten his life by excessive physical activity; he should limit himself entirely to a more or less sedentary life, should not participate in any unnecessary physical exertion, including driving an automobile." Dr. Golden also stated that consultation findings in Wonn's case were malignant hypertension, which is progressive in nature, and fatal in result.

The plaintiff then presented several lay witnesses who testified to the occurrence causing the injuries to the plaintiff. Himes, a special police officer of the City of Elkins, in describing the incident, stated that: "He come down Davis Avenue from towards the post office. He turned in on the yellow line there in front of the Manos Theatre and up onto the sidewalk and—well, he hit some two or three people besides Mr. Keller. He pinned Mr. Keller against the Manos Theatre right where the big glass is, and the car run back off the sidewalk, and as it started to run back the door come open and Mr. Wonn slumped out the door. He was still holding the steering wheel. I run and grabbed the door and shoved Mr. Wonn back up in and pulled the emergency brake. * * *. I straightened him up in the car. His eyes was open, he was breathing pretty hard, * * *."

The witness Joseph stated that he observed Wonn

coming down Davis ,Avenue, went into his newsstand, heard a scream, and came back to the place where the collision had occurred. He stated that he found Mr. Wonn "laying on the seat like this (demonstrating). I don't believe he was quite dead—real purple." Alby Collett stated that: "* * *The car hit and bounced back, so I walked right on around the car to see who it was and maybe help, and when I noticed who it was it was Roy Wonn, so we opened the door and loosened his collar and taken his glasses off and put them in his pocket, and by that time or shortly after that time, why, the ambulances were there so we loaded him onto the cot and put him into the ambulance."

Mrs. Nellie Stalnaker stated that she was at the scene, and when asked as to Mr. Wonn's condition stated: "Well, he was sort of slumped over a little, and some lady unfastened his collar—his tie was choking him like and she unfastened it, and we stood there and looked at him for a second, and he slumped a little and that was all."

The plaintiff also introduced by the proper official the death certificate of Wonn which showed the following: "Disease or condition directly leading to death (a) Massive Cerebral Hemorrhage. Antecedent causes: Due to (c) Hypertension Essential."

At the end of the plaintiff's case, the trial court denied the defendant's motion for a directed verdict. At this point reference should be made to the plaintiff's declaration which was in three counts, the first count charging the defendant's testate with having carelessly, recklessly, etc., driven his automobile from the public street onto the sidewalk, adjacent thereto, and injuring the plaintiff. The second count charged defendant's testate with having caused the injury to the plaintiff by his careless and negligent attempt to park his automobile. The third count alleges that the injury to the plaintiff was "* * * a direct and proximate result of the negligent, heedless, careless, reckless, wantonness and unlawful act and acts of said defendant's testate in driving said automobile with know-

ledge of his physical impairment and contrary to the instructions, advice, directions and orders given to defendant's testate by competent and practicing medical doctors, * * *."

The defendant introduced the testimony of Drs. Condry and Houston. Dr. Houston testified that he had attended Wonn during his hospitalization in 1944; that he was then admitted for gastro-intestinal studies relating to his hypertension; that Wonn did not have malignant hypertension; that his diagnosis was mild arteriosclerotic heart disease and essential hypertension; that he advised Wonn to use discretion, but did not prohibit him from any activity; and that persons suffering from malignant hypertension have, at the most, two or three years of life expectancy.

Dr. Condry, an internal medicine and heart specialist, testified that he first saw Wonn in 1937, after Wonn had been refused life insurance; that his only finding at that time was hypertension; that he then saw Wonn in 1938, 1940, 1945, 1947, 1948, 1950 and 1952; that, between 1937 and 1941, he noted no change in Wonn's condition, but his high blood pressure continued; that in 1945, Wonn's heart appeared the same, blood pressure approximately the same, and an electrocardiogram showed no change; and that no changes were observed up to and including the last examination in 1952. Wonn's blood pressure, throughout this period and as observed by all physicians who examined him closely, was approximately 160/100. Dr. Condry stated that Wonn was not suffering from malignant hypertension; that such disease is fatal within a few months period; that he "suggested that he (Wonn) lose some weight, which he did. I explained or tried to explain to him the nature of the situation, and gave him some sedatives here and there. There are various opinions on what you do for these people. I was not too impressed after seeing him over a period of time that there was anything too severe here, no changes had developed, and so I suggested that he try to get his weight down to within his normal bounds and live a reasonably normal life.", and that he had not forbidden him to drive an automobile.

He further testified that fifty per cent of the persons with Wonn's condition become progressively worse, with enlargement of the heart and subsequently have "heart failure". Dr. Condry also stated that he had signed the death certificate, and that, in the absence of autopsy, his certification of the cause as "massive cerebral hemorrhage" had been "pure guess" based upon the surrounding circumstances and background.

The defendant again moved for a directed verdict at the completion of all the evidence.

The principal issue presented by this evidence is one of first impression in this jurisdiction. In 5 Am. Jur., Automobiles, §178, it is stated that: "The fact that one has a physical defect will not, in itself, render him liable for an injury resulting from the operation of an automobile, or prevent his recovering for an injury, where the defect is not such as to render the operation of the car by him negligence.* * *" Section 179 of the same volume reads as follows:

"Whether or not an individual has knowledge of physical defects or infirmities rendering it dangerous for him to operate a motor vehicle is frequently of considerable importance in determining his liability. One who knows that he is physically unfit to operate an automobile on the highway, as, for example, that he is subject to attacks of such a character as will prevent his operating an automobile as a reasonably prudent man would do, and nevertheless undertakes to drive on the highway, should be held liable for an injury resulting when he sustains an attack while driving, by reason of which he loses control of the car and causes injury to another. Certainly physical infirmities of which a driver of an automobile has knowledge will not relieve him from exercising the care required of an ordinarily prudent person.

"Where, however, the driver has no knowledge or intimation of any physical infirmity, and becomes incapacitated without warning, he cannot be held liable for any injury resulting from the operation of his car while he is so incapacitated.

He must show that the accident was caused by reason of this sudden incapacity."

In *Slattery* v. *Haley*, 52 Ont. L.Rep. 95, 11 B.R.C. 1036 [1923] 3 D.L.R. 156, it was held that a person unaccompanied who was driving his automobile on a city street, supposing himself in perfect health, but who, without any preliminary symptoms or warning, became unconscious and fell back in his car, was not liable, under an act giving a right of action when death is caused by "wrongful act, neglect, or default" for the death of a child killed by the automobile which, when left without guidance, ran upon the sidewalk.

In *Driver* v. *Brooks*, 176 Va. 317, 10 S. E. 2d. 887, the plaintiff instituted an action to recover damages received by her in an automobile collision between a car in which she was riding as a passenger and a car owned and driven by an agent of the defendant. The defendant contended that the agent was not chargeable with negligence because the collision was a result of an unexpected fainting spell. The court stated in the opinion:

"In the instant case, the irregular movements of Johnson's car were undeniably the sole cause of the collision. These movements fully evidenced negligent action on the part of Johnson, unless it were shown that a sudden unforeseen illness caused him to lose control of the car. The burden of such proof, in explanation of his conduct, rested upon the defendants. The evidence in that connection is of doubtful and inconclusive character.

"There is no affirmative evidence that Johnson suffered a fainting spell immediately prior to the collision.* * *"

A jury verdict for the plaintiff was sustained.

In the California case of *Waters et al.* v. *Pacific Coast Dairy*, 55 Cal. App. 2d. 289, 131 P. 2d. 588, where the plaintiff instituted an action to recover for the death of plaintiff's decedent resulting from a collision with defendant's truck, which suddenly cut across a line of traffic striking the car in which plaintiff's decedent was riding, the de-

fense was that at the time of the accident defendant's driver was rendered unconscious by a sudden attack of illness. The court said: "But the defendants did not show the nature of the attack Gomez (driver of truck) suffered, nor the cause thereof, nor that he had no reason to anticipate such an attack. The presumption hereinabove mentioned (presumption of negligence from being on wrong side of road) was brought forward by the plaintiffs. The defendants were called upon to meet it. It remained in the case as part of the proof of the plaintiffs. Such a record presents a question of fact and the determination of the trier of the facts is controlling on appeal."

In the recent case of *Eleason et al.* v. *Western Casualty & Surety Co.*, 254 Wisc. 134, 35 N. W. 2d. 301, involving an action for the death of plaintiff's decedent, who was struck by a truck when the driver suffered an attack of epilepsy which rendered him unconscious for a period of about fifteen minutes, during which period the driver could not control the truck, the court said: "The problem then becomes a question of whether it is negligence for a man to drive a car when he knows that he is subject to such spells. It is considered that, as a matter of law, this is negligence.* * * The evidence warrants no other finding than that Luer knew he was likely at any time to become incapacitated to control a motor vehicle; that in itself is sufficient to make driving a car negligence."

This Court holds that where the driver of a motor vehicle suddenly becomes physically or mentally incapacitated without warning, he cannot be held liable for any injury resulting from the operation of his vehicle while he is so incapacitated, but that where a *prima facie* case of negligence has been established by the plaintiff, the burden is upon the defendant to show the sudden illness or attack, and to further show that the illness or attack was unanticipatable and unforeseen.

The trial court was presented with an unusual decision at the end of the plaintiff's case upon the defendant's motion for a directed verdict, because of the third count in

the plaintiff's declaration, and certain testimony introduced by the plaintiff in support of the allegations in that count. The plaintiff established a *prima facie* case of negligence by the defendant's testate when he proved by several witnesses that Wonn's automobile turned from the regular traffic lane in the street where it was travelling, ran across a restricted parking area of the street and onto the adjoining sidewalk, inflicting injuries upon the plaintiff who was without fault. It became the obligation of the defendant thereafter to show, if she could, that the injuries to the plaintiff resulted from a sudden attack suffered by the deceased, and that such attack was unforeseen and unanticipated. However, the plaintiff, in support of the third count of his declaration, and apparently anticipating the defense's testimony, clearly established by his evidence that the deceased did suffer a sudden attack which caused his death a short time after the injury to the plaintiff, and that the attack was the proximate cause of plaintiff's injuries. However, we find that the trial court correctly overruled the defendant's motion for a directed verdict at that time, inasmuch as the plaintiff had made a *prima facie case* under the first two counts of his declaration, and there was not, at that time, sufficient evidence that the attack was not foreseeable and unanticipated to take the case away from the jury. Thereafter, the defendant presented the testimony of Drs. Condry and Houston and two lay witnesses in an effort to establish, not only that the deceased suffered a sudden physical attack which incapacitated him, but that it was unforeseeable.

It becomes necessary at this point to examine the assignments of error of the defendant, relative to the admission of certain testimony of the plaintiff, over the objection of the defendant. We find no error in the admission of the testimony of Dr. Goodwin, the eye, ear, nose and throat specialist, who testified that he had attended the deceased at the Davis Memorial Hospital in 1940, and treated him for a severe nosebleed, although Wonn did not die until 1952.

In *Yuncke* v. *Welker*, 128 W. Va. 299, 36 S. E. 2d. 410, the fifth syllabus point reads as follows: "Whether evidence offered is too remote to be admissible upon the trial of a case is for the trial court to decide in the exercise of a sound discretion; and its action in excluding or admitting the evidence will not be disturbed by the appellate court unless it appears that such action amounts to an abuse of discretion."

A more serious question arises, however, by the admission of evidence of Dr. Goodwin, using as the basis of his testimony the records of the Davis Memorial Hospital, upon which notations had been made by other examining physicians. Dr. McGee had made the examination of the deceased and the entries on the hospital record in 1940, and Dr. Houston had examined the deceased and made certain notations thereon in 1944. Upon the proof that Drs. McGee and Houston were out of the jurisdiction and unavailable, Dr. Goodwin was permitted to testify from those records as to the findings of these other physicians, although Dr. Goodwin himself was firm in his statement that his practice was limited to "eye, ear, nose and throat", and that he did not at any time make an examination of any part of the deceased's body except his nose. The entry in the hospital record made in 1940, and read to the jury, showed that the examining physician, Dr. McGee, found the deceased to be suffering from "hypertensive disease". The hospital record, which was read to the jury, pursuant to the 1944 entries, showed that there was a final diagnosis by the examining physician, Dr. Houston, of "arteriosclerosis, heart disease".

The "shop-book" rule has been long recognized in this jurisdiction, although the necessity therefor has been lessened by virtue of Code, 57-3-1. Furthermore, this Court has recognized the "regular entry" rule, and has admitted such evidence when properly identified, when the person who made the entry was unavailable because of death, insanity or absence from the jurisdiction. *Bourn* v. *Dobbins*, 92 W. Va. 263, 115 S. E. 424. In discussing the admissibility of hospital records under the "regular entry"

rule, this Court, in *Cline* v. *Evans,* 127 W. Va. 113, 31 S. E. 2d. 681, said: "It seems unnecessary to determine to what extent, and in what circumstances a hospital record may be introduced in evidence. If properly identified, and shown to have been made up in the regular course of treatment, it may be plausibly argued that by analogy to rules governing the keeping of books and records, the same may, when properly identified and within proper limits, be admissible as to routine matters, although there is little authority to support such a rule. But here the records were not even identified, and there is no showing whatever as to who kept or supervised them.* * *" While it may be considered dictum, this further statement from the opinion in the *Cline* case is persuasive: "* * * Then, we think, a record which merely assumes to state the opinion of a surgeon or pathologist is not admissible as tending to show any fact. If there was a tuberculous infection, as indicated by this record, the person who made the test should have been called upon to testify. The defendants had the right to test that theory by cross-examination or otherwise, and, of course, they had no opportunity to cross-examine. If the hospital records were inadmissible to show the fact of tuberculous infection, as we think they were, and if the assumed opinion of the pathologist was at best hearsay, as we think it was, then the hospital records furnished no basis for their use in propounding the hypothetical question to Dr. Wilkinson, and that question was improper.* * *"

Congress and more than one-third of the States' Legislatures have adopted legislation relative to the requirements of the admission of regular entries, but this State has no such statute. In *New York Life Ins. Co.,* 79 App. D. C. 66, 147 F. 2d. 297, the defendant offered a hospital record showing diagnostic findings of an attending psychiatrist, the pertinent part of which follows: "Diagnostic impression; psychoneurosis, hysteria, conversion type." The Circuit Court of Appeals held that this record was inadmissible under the Federal Business Records Act, although there was a strong dissent. In the subsequent

Federal case of *Buckminster's Estate* v. *Commissioner of Internal Revenue,* 147 F. 2d. 331, (C.C.A. 2d. Nov. 6, 1944), a contrary result was reached.

While there was little authority upon the question at the time *Cline* v. *Evans, supra,* was decided, there is considerable authority at present. For a discussion of this question, and extensive citations of case law, reference is made to 54 Yale Law Journal, 868; 23 Texas Law Review, 178; 48 Columbia Law Review, 920; and 26 Tulane Law Review, 371.

This Court cannot lay down a rule that would be applicable to all entries in hospital records. Certainly, routine entries, and perhaps ordinary diagnostic findings, based upon objective data, and not presenting a question of obvious difficult interpretation, should be admitted. However, as hereinafter noted, the question is not directly presented by this record. The admission in the instant case of the entry of Dr. McGee showing that in 1940 deceased was suffering from "hypertensive disease" could not have prejudiced the defendant, inasmuch as all of the medical evidence, including the two physicians who testified for the defendant, was to the effect that deceased had suffered from hypertension or high blood pressure prior to 1940. Inasmuch as the defendant called Dr. Houston as a witness, she waived her objection as to the entries made by this physician on the hospital record in 1944.

Dr. Golden testified, as heretofore stated, that within seventy-two hours after the examination by Dr. Houston in 1944, and after he had secured knowledge of the condition of Wonn by virtue of a staff conference, that he made the statement to the deceased, which was heretofore quoted. Thereafter, when asked by counsel for the plaintiff what he meant when he stated that the deceased's condition was of a "progressive nature", he was permitted to answer, over objection, as follows: "Consultation findings in this case were malignant hypertension, and malignant hypertension, which is a term which is not totally specific but is progressive in nature and is final in its results." The testimony as to the information which Dr. Golden

gave the deceased was admitted under the verbal act rule. Wigmore on Evidence, Volume VI, Third Edition, Pages 177-240.

In the case of *State of West Virginia* v. *Corbin,* 117 W. Va. 241, 186 S. E. 179, the fourth syllabus point reads as follows: "Where it becomes relevant to show that a certain statement or declaration was made, regardless of the truth or falsity of the statement or declaration itself, such proof is not hearsay and should be admitted. It is evidence of what, in some of the books, is termed a 'verbal fact'."

The trial court offered to admonish the jury that they should consider only that part of the statement of Dr. Golden that informed the deceased that his condition was serious, and that he should limit his physical activities. However, counsel for the defendant declined to accept that limitation, and insisted upon their objection to the entire statement. Again it is material to note that the defendant later introduced Dr. Houston as a witness, who denied that he found by his examination in 1944 that the deceased was suffering from malignant hypertension, or that he informed Dr. Golden to that effect. He further stated that from the physical condition of the deceased at the time he examined him, he had no reason to request the deceased to limit his activities as Dr. Golden had informed the deceased. In view of the fact that the defendant produced Dr. Houston as a witness, subsequent to the testimony of Dr. Golden, she waived her objection to his testimony.

The plaintiff offered no evidence to rebut that of Drs. Condry and Houston that Wonn was not suffering from malignant hypertension, and that if he had been suffering from such a disease, he would have had only a short time to live. Wonn lived approximately seven years after Dr. Golden testified that it was his opinion that he was suffering from malignant hypertension.

The only evidence in this record to indicate that the deceased could have foreseen or anticipated that he would

have a sudden attack, such as cerebral hemorrhage, which would cause him to lose control of the automobile which he was operating, and therefore render him negligent by operating such a vehicle, was that of Dr. Golden. A careful analysis of the statement, which he testified that he made to Wonn in 1944, shows that Wonn was not informed that if he operated an automobile he might have a sudden attack of some kind which would result in serious consequences to himself or others. He was simply told that he should not "participate in any unnecessary physical exertion including driving an automobile", and that "he could shorten his life by excessive physical activity." There is no evidence in this record that the deceased, prior to the day of his death, had a "stroke", fainting spell, or any other type of attack that rendered him dizzy or unconscious. By the testimony of Drs. Houston and Condry, the defendant clearly met the requirement that she show that the deceased had no reason to foresee or anticipate the sudden attack with which he was seized on the day of his death which resulted in the injuries to the plaintiff. There was no evidence, medical or lay, to the contrary. Therefore, there was no factual question for jury determination. The trial court should have sustained the motion of counsel for the defendant at the end of all of the evidence to direct a verdict for the defendant, and its failure to do so was reversible error. "Where in a trial of an action at law before a jury, the verdict returned is without evidence to support it, or is plainly wrong, it will be set aside by this Court, the judgment entered thereon reversed, and the case remanded for a new trial." *DeLuz, et al.* v. *Board,* 135 W. Va. 806, 65 S. E. 2d. 201.

The instructions will not be discussed since the alleged errors relating thereto should not recur in view of the principles of law enunciated herein.

The judgment of the Circuit Court of Randolph County is reversed, the verdict of the jury set aside, and the case remanded for a new trial.

*Reversed and remanded.*