# CHARLESTON.

GUY F. WALDRON v. GARLAND POCAHONTAS COAL CO.

Submitted October 25, 1921. Decided November 8, 1921.

1. DEATH—*Contributory Negligence of Father Consenting to Deceased Son's Employment in Mine Held Question for Jury.*

If a father consents to the employment of his son, under 16 years of age, in a coal mine, or, after the son is employed therein, he acquiesces in and agrees to the continued employment, and, afterwards, the son while so employed, is killed by an accident arising from one of the ordinary risks of the employment, the contributory negligence of the father in consenting to the employment, or in acquiescing therein after the employment, will prevent recovery of damages for his sole benefit against the coal mining company; but if there is a

serious and substantial conflict in the evidence as to whether the father did in fact agree to or acquiesce in the unlawful employment, it becomes a question for the jury.  (p. 428).

2.  MASTER AND SERVANT—*Relation of Independent Contractor Held Not Created.*

Whether a person performing work for another is an independent contractor depends upon a consideration of the contract of employment, the nature of the business, the circumstances under which the contract was made and the work was done.   And if it appears that the owner of the business retains general control of the premises where the work is being performed, and has power to direct when it shall be performed, furnishes part of the equipment, does a portion of the work himself necessary for the continuance of the work to be done under the contract, pays the contractee a stipulated price per square yard of the work performed, and that there is no fixed time for the termination of the contract, the relation of independent contractor is not established; although the contractee under  such contract employs and discharges his employees on the work, and pays them out of the money he derives from the contract.  (p. 432).

33.  SAME—*Relation of Independent Contractor Must be Proved by Mine Owner.*

To avoid liability for personal injuries to an employee in a coal mine, on the ground that the work therein at which the employee was injured was being done under contract by an independent contractor, and that therefore the  relation of master and servant did not exist between the injured person and the mine owner and operator, it is incumbent on the mine owner to prove all the facts and circumstances necessary to establish that the work was being done by an independent contractor.  (p. 432).

(RITZ PRESIDENT, absent.)

Error to Circuit Court, McDowell County.

Action by Guy F. Waldron, as administrator of his son, Philip Waldron, deceased, against the Garland Pocahontas Coal Company for damages for deceased's death.   Verdict and judgment for the plaintiff, and the defendant brings error.

*Affirmed.*

*Sanders, Crockett, Fox & Sanders,* and *Strother, Taylor & Taylor,* for plaintiff in error.

*John Kee* and *Russell S. Ritz,* for defendant in error.

LIVELY, JUDGE:

From a verdict and judgment for $10,000.00, rendered on the 17th day of February, 1921, defendant prosecutes this writ of error.

Plaintiff instituted this action for damages as administrator of Philip Waldron, alleging that the intestate, his son, a boy between the age of 13 and 14 years, was negligently killed while in the employ of defendant in its mine on September 11, 1919.

The defense relies on two grounds; (1) contributory negligence on the part of the father and administrator, in that he consented to or acquiesced in the employment of the boy in the mines; and (2) that at the time the boy was killed he was not in the employ of defendant, but was working in the mine for an independent contractor, a Mr. Thompson, who was driving an entry for defendant.

The boy had been in the habit of working away from home, and about three months before he was killed he, with his father's consent, went to the home of H. F. Short, his step-grandfather, who lived about one mile from defendant's mines, and who promised to put the boy in school.    In the early part of August Short asked the manager of defendant coal company if he could give the boy employment, and was answered in the affirmative, conditioned, however, on the boy's being 16 years of age or over, and Short replied that he would have the father to sign a statement about the boy's age.    Such statement was afterwards brought to the manager and reads: "Aug. 12, 1919.   Garland Pocahontas Coal Co.   Gentlemen: Phil Waldron is my son, he is 16 years old.   Guy Waldron."    The boy was employed as a trapper in the mine.    About two weeks prior to the boy's death, Short was on a visit to the boy's father and mentioned to him that he had sent the boy to him prior to that time to have him sign a paper about his age, so that he could get employment from Mr. Baldwin, and the father replied that he had not seen

the boy; that he had not come home; that he had not signed any such paper.   Short then told the father that he would tell Baldwin not to work the boy and the father replied, "No, never mind, just leave the boy alone," and on being pressed he testified that the father might have added, "Maybe he will come home."   The father's version of that conversation is that when Short told him that the boy was at the mine he told him that he would suffer his right hand to be cut off before he would sign a permit; that the child was too young to work in the mines and that he wanted him to go to school. Then Short told him he would tell Mr. Baldwin not to work him, to which he replied: "Maybe we had better let him alone, maybe he will come home in a few days."   The Sunday before the boy was killed the father was on a visit to Short, who then told him that the boy had left his house and was staying at a boarding house, was doing no good, getting a dollar a day, and for him to go up there and  take the boy home, and the father then told him he would have the boy sent to the reform school.   The father said he was looking for the boy to get him on the train to take him home, but after the train passed the station he saw the boy standing on the porch of the company's store.  Both the father and mother say they had heard that the boy was working for defendant, but did not know it to be true, and did not know what work he was doing.   There was one question propounded to the father which indicated that he had heard that the boy was working in the mine.   He was asked, "How long was it before he was killed that you heard he had been working in the mine?"   Answer: "I couldn't say positive, it might have been a week or two weeks."   It will be observed that the question related particularly to the time when he had received information, and not specially to whether the employment was in or out of the mine.   After the boy had gone to his grandmother's house, he made one or two visits to his father's home, five or six miles away, when his father purchased for him a pair of shoes, but did not ask the boy if he was working or for whom; and it does not satisfactorily appear whether these visits were before or after the boy had gone to work for defendant.   It is on this evidence that the

claim of defendant is based, that the father, and administrator, consented and acquiesced in the employment of his boy in the mine, at a dangerous occupation, and therefore was guilty of such contributory negligence as to preclude recovery. Under this evidence, can we say that it is proven with sufficient conclusiveness that the father acquiesced in or consented to the employment in the mine, to impel us to hold as a conclusion of law that the father was guilty of contributory negligence? It does not appear with any reasonable degree of certainty that the father knew the boy was trapping in the mine or hauling slate out of the mine. He never saw the boy at any kind of work there; and it is clear that he refused to give any permit, and wanted the boy to go to school. There is no variance between the evidence of the grandfather and the father on the refusal to give a permit, or to make the written statement that the boy was 16 years old. We pause here to say that much of the evidence relating to the permit or the apparent age of the boy is of no materiality. Under sec. 24, chap. 15 H, Code, 1918, making it unlawful to permit a boy under 14 years of age to work in a coal mine, an affidavit was required, before employment, from the parent or guardian that the boy's age is 14 years or more, and which affidavit as to the employer was conclusive as to the age of such boy. But by chap. 17, Acts, 1919, passed February 11, 1919, and in effect ninety days from its passage (and in effect when this boy was employed) it is provided in sec. 2, ''No child under the age of sixteen years shall be employed, permitted or suffered to work in any mine, quarry, tunnel or excavation,'' and there is no provision for affidavit as to age. This act expressly repeals sec. 24, chap. 15 H of the Code. The fact that the child is under 16 years of age makes the employment unlawful; and, if injury results, there is prima facie negligence on the part of the employer. See *Norman* v. *Coal Co.*, 68 W. Va. 405; *Daniel* v. *Big Sandy C. & C. Co.*, 68 W. Va. 491; *Blankenship* v. *Coal Co.*, 69 W. Va. 74; *Dickinson* v. *Stuart Colliery Co.*, 71 W. Va. 325; *Griffith* v. *American Coal Co.*, 75 W. Va. 686; *Mangus* v. *Coal Co.*, 87 W. Va. 718. Many modern decisions are that the failure to perform a statutory duty in such cases is negligence per se. See L. R.

A. 1915 E. p. 506, note to the case of *Conway* v. *Monidah Trust* (Mont.)    The prima facie presumption of negligence is not attempted to be overcome in this case.    It is tacitly conceded that the employment was unlawful.    Even under the old law an affidavit of the parent or guardian as to the child's age was required, and no affidavit was had, simply a written statement that the boy was the son of Guy Waldren and sixteen years of age.    The employment was unlawful even under chap. 15 H, Code of 1918, and the subsequent injury makes a prima facie case of negligence on the employer. But we recur to the question of contributory negligence of the father.    Can we say that because the father permitted the child to work "here and there" at various occupations, not of a dangerous nature, that he permitted the boy to go to his grandparents three months before his death for the avowed object of giving him schooling, that, after he had heard that the boy was at work for defendant under an alleged permit from him, the father, he then neglected to go and take him home, and upon a suggestion that the employer would be asked not to give the boy further work, he replied, "No, maybe we had better let him alone, maybe he will come home in a few days," constitutes such contributory negligence as to defeat recovery?    It is not clearly shown that he knew the dangerous character of the employment.    Surely there is no suggestion in the evidence that he knew the boy was trapping in the mine, or was hauling out slate or rocks.    May he not have presumed that the employer would not, and had not placed the boy in the mine in direct violation of the statute prohibiting the employment of boys under 16 years in a mine?    As a conclusion of law, can we hold, as we are asked to do, that contributory negligence has been conclusively established, and therefore the jury should have been instructed to find for the defendant?    In the case of *Daniels* v. *Fuel Co.*, 79 W. Va. 255, the evidence was conclusive that the father knew and consented to the employment of the boy, who lived with the father, worked with him outside of the mine, traveled to and from the mine with him, and knew that he went into the mine.    In *Swope* v. *Coal & Coke Co.*, 78 W. Va. 517, recovery was precluded because

the father abandoned the wife and children, was divorced, and the custody of the children awarded to the wife, who exposed the child to a dangerous employment resulting in its death.    In these cases there was no controversy on this question.    It is well settled that when contributory negligence depends upon questions of fact it is for the jury to decide. *Foley* v. *Huntington,* 51 W. Va. 396; *McCreery* v. *Ohio R. R. Co.,* 43 W. Va. 110.    Where there is evidence tending to prove contributory negligence the jury should be left free to give such evidence the consideration to which it may appear to them to be entitled.    *Webb* v. *Big Kanawha Packet Co.,* 43 W. Va. 800.    But where the facts are uncontroverted the court may determine the question.    *Phillips* v. *County Court,* 31 W. Va. 477.    And the question of the estoppel of the plaintiff on this ground was submitted to the jury in defendant's instructions Nos. 8, 9, 13.    These instructions were to the effect that if the jury believed that the father gave his consent to the employment, either expressly or impliedly, or acquiesced therein, he was guilty of contributory negligence and recovery would be barred.    We are now asked to say that defendant made a mistake in asking for these instructions; that it was the duty of the court to have held that contributory negligence had been clearly shown, and the jury instructed to find for defendant.    We think these instructions were proper.    It was a jury question.    On this conflicting evidence the jury found that the father did not do so.    Can we disturb that finding?    The evidence and circumstances point strongly to the father's knowledge of the employment, not necessarily employment in the mine; and it may be conceded that he should have exercised more strict parental care of his boy of so tender an age, and at all times should have known of his whereabouts and doings, but the jury has determined otherwise.    *Young* v. *W. Va. P. R. R. Co.,* 44 W. Va. 218; *Poague* v. *Spriggs,* 21 Gratt. 220.

We now come to the other defense interposed, that at the time the boy was killed he was not in defendant's employ, but was working for one Thompson, stated to be an independent contractor in defendant's mine.

Short came to the general manager, Baldwin, on the 11th

of September and informed him that he had talked with the boy's father and had advised that the boy ought to be in school, and the general manager immediately went to see his assistant mine foreman Riffe, and directed him to discharge the boy, giving as the reason therefor that he was apprehensive of the boy's age.     Riffe went into the mine and discharged the boy about noon, stating to him that he would discharge him rather than let him work on the rock (the work at which he was killed that night). Riffe was under the impression that Baldwin directed the discharge of the boy because he understood that he was going to work on the rock. At least, that was the reason he gave to the boy for the discharge.     It appears that Will Thompson had a verbal contract with defendant to drive an entry by blasting away the rock and slate and hauling it out of the mine to the slate dump, at $4.00 per yard.     Thompson furnished the explosives, hired and discharged the men engaged, defendant drilled the holes in the daytime and Thompson shot them at night and hauled the rock out of the mine upon cars furnished by defendant and hauled by defendant's ponies.     Thompson paid the men employed.     It is not clear whether the men were paid by the company and the amount charged to Thompson and taken out of the $4.00 per yard paid him, or whether Thompson drew all the money and paid the men therefrom. The only evidence on that point is from Baldwin's testimony where he was asked: "Who paid the men that he (Thompson) engaged on the work?"     Answer: "Mr. Thompson. It came out of his pay."     When Thompson took this contract he had some trouble with a pony and was told by Baldwin that he would send up Blaine to show the road.     The first night the boy came to him to drive, followed by Blaine about one hour afterwards, who made one trip and left, saying the boy knew the road and could get along all right.     It does not appear what position or employment Blaine had with the defendant company.     The following night the boy came back to drive and drove the pony awhile and at that time asked Thompson for employment as a driver, but Thompson did not hire him, and the next night, the 11th of September, the boy came back again and said the boss had sent him up to

drive, and was killed instantly about 11 o'clock that night by falling off of the loaded car, which ran over him. Thompson says the boy was not working for him, not in his employ. Defendant says the boy had been discharged and paid off that afternoon and warned not to go about the mines. Thompson says that the first night the boy came up he brought the pony from the barn, hitched it to the car outside of the tipple and drove into the mine. Several witnesses testify that in the afternoon of the 11th Riffe went out and brought the boy back to the mine to do trapping that afternoon in the place of Cyphers, whom he desired to do other work, and two or three witnesses saw the boy doing that work that afternoon. Riffe denies this. Baldwin paid the boy his wages about 5 o'clock that afternoon and told him he was not to work for them any more; and later, near dark, saw the boy taking the pony to the mine, and again told him not to go into the mine, but was told by the boy that he would take the pony to Thompson and come right out again. He came out dead. Here we have both the company and Thompson denying the employment, and yet the boy was working. The original employment at the mine was unlawful. If the boy had not been employed, the unfortunate death would not have occurred. To avoid liability it is asserted that Thompson must have employed the boy to do the driving, and Thompson being an independent contractor, defendant is absolved from any duty to his servants and employees.

Who is an independent contractor? This query raises many nice distinctions and its answer depends upon a consideration of the contract, the nature of the business, and the circumstances. Generally where a defendant has contracted with a competent person, exercising an independent employment, to do work not in itself dangerous to others, according to the contractor's own method, and without his being subject to control in any important particular, except as to the result of his work, he will not be chargeable for the wrongs of such contractor committed in the prosecution of the work. *Carrico* v. *Railway Co.*, 39 W. Va. 86. Here there are many factors which militate against the contention that Thompson was an independent contractor. The heading was in the

mine and was being driven while the coal was taken out and the mining operations carried on.    Defendant had general control of the mine and of all the work therein.    An important part of the work on the heading was done by defendant.    It drilled the holes in the daytime, and Thompson shot them by explosives at night.    Its machinery and equipment were used in the work.    Its cars and ponies were used to haul out the rock.    It sent Blaine, its employee, into the mine to help with the pony; and the   evidence points strongly to the fact that the boy was sent the first night by someone in authority for that purpose.    No time was fixed for the termination of the contract, and the life of the contract evidently depended upon the co-operation of defendant. If the holes were not bored, the work would not proceed.    The mining of coal was the controlling business; and the driving of the entry was subservient thereto, and subject to the convenience of the owner.    It does not appear how many yards Thompson had contracted to remove, or when or for what cause his employment might have been dispensed with.    It is conceded that the work was as dangerous as any other mining work.    The stipulated price per yard contracted to be paid is of little significance.    Thompson employed and discharged his help, a strong index of the relation of an independent contractor, but not conclusive.    Thompson, when asked if he had absolute control over driving the entry replied that he was under the mine foreman's instructions; but that he had absolute control of hauling the slate out of the mine, employing and discharging the men, buying the explosives, and everything of that kind, until ''they'' gave him further orders and ''they didn't give me no further contrary orders about that.''    If a right of control is in the employer, it is immaterial whether he actually exercises it.    16 Am. & Eng. Ency. Law, p. 188.    Why did Thompson permit the boy to work if he did not employ him?    In response to his request of Baldwin for someone to drive the refractory pony, the boy came from the stables with the pony and hitched it to the car.    The night he was killed, he appeared by order of the ''boss.''    Thompson knew the boy was employed as a trapper.    This indicates that Thompson recognized some au-

thority in defendant in the selection of workmen.    It has some probative value, and is one of the indices of the relation of the parties.    "The vital test in determining whether a person employed to do certain work is an independent contractor or a mere servant is the control over the work which is reserved by the employer.    Stated as a general proposition, if the contractor is under the control of the employer, he is a servant; if not under such control he is an independent contractor."    14 R. C. L., p. 67, and numerous authorities there cited.    As hereinbefore stated, it does not appear whether defendant paid the men and charged the sums against Thompson's $4.00 per yard, or whether the contract price was paid in full to him, out of which he then paid them.    When asked, who paid the men, Baldwin answered: "Mr. Thompson.    It came out of his pay."    While payment direct to the men by defendant would have little weight, being possibly a matter of convenient arrangement, it would indicate that defendant was solicitious that the men who drove their entry should be paid—an indication of supervision, although slight. The burden is upon the defendant to prove all the facts necessary to constitute Thompson   an independent   contractor. *Kirkhart* v. *United Fuel Gas Co.,* 86 W. Va. 79.    Payment "by the job", by the yard, or by the ton with power to employ and discharge employees in the performance of the work is not alone sufficient to create the relation of an independent contractor, although it is a circumstance strongly indicative thereof.    *Knicely* v. *Railroad Co.,* 64 W. Va. 278. If a coal mining company could create this relationship by "letting out contract work" in mining its coal, at a stipulated price per ton or bushel, it could avoid liability to the miners engaged in the work for injuries received by them.    By contracting with a financially irresponsible independent contractor, payment for personal injuries might be totally defeated.    We do not think the verbal contract with Thompson as set up in this case, taken together with the facts concerning the operation of defendant's coal mine, is sufficient to warrant us in holding, as a conclusion of law, that Thompson was an independent contractor.    Hence, if Thompson, in charge of the work and representing defendant, hired the boy

(which he denies) defendant is liable; or if Thompson permitted the boy to work in the mine, (which is not disputed) the liability is not changed.    The statute says "No child under the age of 16 years shall be employed, permitted or suffered to work in any mine, quarry, tunnel or excavation." This inhibition applies to the owner of the mine as well as to all other persons.   It is his duty to see that no such child is employed or permitted to work in his mine.   He cannot avoid this duty by attempting to shift it upon another.   This defendant had control of its mine as a whole and was operating it.    The driving of the entry was a mere incident of the operation, a detail; and when it permitted, either advertently or inadvertently, this child to work therein, it became civilly responsible for injuries resulting to him therefrom.    There is very persuasive evidence to show that defendant knew or should have known, that the boy was driving the pony at night.    He went the first night at the instance of someone, other than Thompson, to drive the pony.    Blaine, who was sent by Baldwin on that mission, at that time saw the boy driving, and after making one trip with the pony, left the boy there for that purpose.    Riffe, the assistant mine foreman, seemed to know something about it, for he discharged the boy, as he says, because he wanted or intended to "work on the rock."    The boy brought the pony from defendant's barn, and hitched it to the mine car and drove into the mine. After discharging the boy at noon, Riffe again brought him back to  do trapping in the afternoon, under what arrangement or understanding it does not appear.    Riffe denies that he did so, but several witnesses make it certain that the boy came back and worked.

Error is assigned because plaintiff's instructions Nos. 1, 2, 3 and 4 do not incorporate therein the theory of contributory negligence on the part of the father in permitting, or acquiescing in, the employment of the boy in the mine.    Defendant's instructions 8, 9 and 13 fully cover this theory. It is not necessary to insert in each instruction all the exceptions, limitations, conditions and theories which are inserted in the instructions as a whole.    The instructions must

be taken and considered together.     *State* v. *Dodds*, 54 W. Va. 289; *Normile* v. *Traction Co.*, 57 W. Va. 132.

From what we have said, it follows that defendant's instruction No. 1, directing a verdict for defendant; instruction No. 2, charging that the burden was on plaintiff of showing that the boy was employed by defendant at the time of his death; instruction No. 4, charging that if the boy had been discharged by defendant and employed by Thompson at the time of the injury the verdict should be for defendant; and No. 5, instructing that if the boy had been discharged and told not to go in the mine but afterwards went to work with Thompson, hauling slate, then the relation of master and servant did not exist between the boy and defendant, and the verdict should be for defendant; were all properly refused.

We affirm the judgment.

*Affirmed.*