GUY E. MCCOY, *et al.*

*v.*

HENRY COHEN, *et al.,*

JAMES H. HALL, *et al.*

*v.*

HENRY COHEN, *et al.,*
*and*
FRED ARBOGAST, *et al.*

*v.*

HENRY COHEN, *et al.*

(No. 12310)

Submitted September 16, 1964.   Decided February 23, 1965.

*Clifford, Jones & Williams, James C. West, Jr.,* for appellants.

*Herschel Rose, Stathers & Cantrall, Mary Frances Brown,* for appellee Henry Cohen.

*Robinson, Stump, Highland & Morgan, James E. McNeer, Thomas E. Morgan,* for appellee Norman C. Slaughter.

*Steptoe & Johnson, James M. Guiher, Kingsley R. Smith, Max D. Rizley,* Tulsa, Okl., for Dow Chemical Co.

HAYMOND, JUDGE:

In these three separate civil actions which involve the same legal questions, instituted in the Circuit Court of Lewis County in October 1962 and January 1963, the plaintiffs in one action, Guy E. McCoy and Aunie McCoy, husband and wife, owners of a parcel of one and one-half acres of land in Hacker's Creek District, Lewis County, improved with a five-room dwelling house occupied by them as a residence; the plaintiffs in another action, James H. Hall and Patricia Ann Hall, husband and wife, owners of a parcel of land containing one and one-half acres, also situate in Hacker's Creek District, Lewis County, improved with a dwelling house occupied by them as a residence; and the plaintiffs in the third action, Fred Arbogast and Helen Arbogast, husband and wife, owners of a parcel of land containing one acre, also situate in Hacker's Creek District, Lewis County, improved with a dwelling house occupied by them as a residence, which parcels are part of a 240 acre tract which is subject to the oil and gas lease involved in this litigation, seek to recover from the defendants in each action, Henry Cohen, Norman C. Slaughter, Dowell Division of Dow Chemical Company, a corporation, and Halliburton Company, a corporation, which during the trial was dismissed from the consolidated actions, damages for the pollution of

the fresh water wells of each of the plaintiffs located on their respective residence properties at distances of approximately 270 to 450 feet from a gas well known as Woofter No. 1, which was drilled by the defendant Slaughter on another and separate portion of the 240 acre tract under an oil and gas lease owned by the defendant Cohen but which well was not drilled on any of the lands owned by any of the plaintiffs.

The basis of the claims of the plaintiffs is that the pollution of the fresh water wells of the plaintiffs and the resulting damage to their properties were proximately caused by the negligence of the defendants in drilling, casing, cleaning, swabbing and sealing the Woofter No. 1 gas well on other property near or adjacent to the properties of the plaintiffs.

The actions were consolidated for trial with the understanding that separate verdicts and separate judgments would be entered in each case and certain agreed facts were stipulated under a pretrial order entered March 21, 1963. Upon the trial at the March Term 1963 the defendants moved the circuit court for directed verdicts at the conclusion of the evidence introduced by the plaintiffs, which motions were overruled as to all the defendants except the defendant Halliburton Company as to which the motion, not being opposed by the plaintiffs, was sustained. At the conclusion of all the evidence the remaining defendants renewed their motions for directed verdicts which motions were sustained on the grounds that any damage sustained by the plaintiffs was permanent rather than temporary and that the defendants were not guilty of negligence in their operations in the drilling of the gas well which was the proximate cause of the injuries sustained by the plaintiffs.

On April 20, 1963, the circuit court entered judgments in favor of the defendants upon the directed verdicts and by order entered June 17, 1963, overruled the motions of the plaintiffs for a new trial in each of the consolidated actions. From the judgments rendered April 20, 1963, this Court granted these appeals upon the application of the plaintiffs.

The defendant Henry C. Cohen is the owner of the oil and gas lease on the 240 acre tract of land which covers each of

the parcels owned by the plaintiffs. He took no part in the drilling operations although he was represented by other persons who kept in touch with him and kept him informed of the situation in connection with the drilling. Sometime in October or November 1960 Cohen met the defendant Norman C. Slaughter at a point on a public road in Lewis County and entered into a verbal agreement with Slaughter, who was an experienced drilling contractor, to drill three wells for Cohen, one of which was the Woofter Well No. 1 involved in this litigation. According to Slaughter, he was to drill the well to and through the Big Injun Sand at the rate of $4.00 per foot and to furnish the rig and the men for the drilling of the well, which included the pulling of the outer casing and the swabbing and the closing of the well. Slaughter directed and supervised his own workmen. He selected them, paid their wages and fixed their working hours. The four and one-half inch casing used in the well was purchased by Cohen but it was installed by Slaughter, the driller.

The defendant Dowell Division of Dow Chemical Company, sometimes referred as as Dowell, was employed by the defendant Cohen to fracture the well, which it did in three separate operations on two occasions on March 31 and April 7, 1961.

The drilling operations began on February 13, 1961 and continued until April 26, 1961, at or about which time the well was properly sealed or "closed in" to prevent the escape of any gas from the well. The well produced a small quantity of gas, approximately 85,000 cubic feet, but did not produce any oil. The well was drilled to a total depth of 1765 feet on March 24, 1961. In the drilling of the well 205 feet of eight and one-fourth inch pipe and 895 feet of seven and one-fourth inch pipe were used as outside casing, and the inside casing, consisting of 1765 feet of four and one-half inch pipe, extended inside the larger casing from the top to the bottom of the well.

On March 29, 1961, after the four and one-half inch casing had been installed, the well was cemented by Halliburton Company. In this operation a mixture of sixty five sacks

of cement was forced downward through the four and one-half inch casing to the bottom of the well and thence upward into the open space between the bore hole and the outside of the four and one-half inch casing called the "annulus." By this process the casing was cemented solidly for a distance of 700 feet from the bottom of the well to a point about 1050 feet below the surface or top of the casing. Before injecting the cement Halliburton Company circulated the well with fresh water and a "gel" compound for the purpose of cleaning and sealing the bore hole.

As no oil and no gas in paying quantities were found in the Big Injun Sand, Cohen and Slaughter decided to extend the drilling of the well below the Big Injun Sand, which is located approximately 1315 feet below the surface, to and through the Gantz Sand, which is located at a depth below the surface of approximately 1700 feet. The object of the cementing operation was to prevent the fracturing fluid from entering any waters or any sands or zones other than the producing sands involved in the fracturing process.

On March 30, 1961, after the well had been cemented, Slaughter's crew pulled and removed from the well the outside casing consisting of the eight and one-fourth inch pipe and the seven and one-fourth inch pipe.

On March 31, 1961, the well was perforated by Schlumberger Company. This operation consisted in the shooting of holes by special apparatus in a horizontal direction through the four and one-half production casing and the surrounding cement at the level of the particular sand to be fractured and at that time the Gantz Sand, which is located at a depth of approximately 1700 feet, was fractured. The fracturing operation was performed by the defendant Dowell. Its purpose was to stimulate the flow of gas or oil from some particular sand into the well and it involved the use of fluids consisting of hydrochloric acid and detergents mixed with quantities of fresh water and sand.

The first fracturing operation began at 4:05 o'clock in the afternoon of March 31, 1961. The required pressure was applied to force the fluids into the Gantz Sand at 4:15 o'clock

and the fracturing operation was completed at 4:32 o'clock in the afternoon of the same day. After the fracturing operation on March 31, residual fracturing fluid in diluted form was discharged through the four and one-half inch casing to the top of the well from which point it was conducted by a pipe to a sludge pit for some distance from the rig or top of the well. This pit was about fifty feet by twenty feet in area and from five feet to six feet in depth. According to the testimony of Slaughter, as this fluid passed from the top of the well a nipple was placed on the casing to facilitate the flow of the fluid to the sludge pit. During the flow of the fluid from the top of the casing some of it could have fallen on the floor of the rig and extended down into the hole outside the four and one-half inch casing. After the fracture of the well on March 31, the well was drained or "blown" on April 1 and on April 3 and succeeding days the crew of the defendant Slaughter swabbed or cleaned out the well and in that operation removed some of the residual frack water. On April 4, 1961, according to Slaughter his crew put a metal shield around the four and one-half inch casing at the top of the well and packed it with red mud.

The plaintiff James Hall testified that about April 6, 1961, he first detected something wrong with his well water when he was taking a shower and that the next day he went to the well where he saw Claude Meadows, the driller, and his tool dresser, and that there was oil on the rig floor around the drill hole or pipe; that the boards had been pushed back on each side of the four and one-half inch pipe; that he walked to the well to see if there was any casing or pipe in the well and that he did not see any; that the swab was down in the hole at the time for use in pulling water out of the well; that he could see down the hole for some distance and could not see any water but that when the swab was coming up the hole the water started to roll out; that at that time the hole was full of water but that after a minute or so the water disappeared down the hole and out of sight; that he told Meadows, an employee of Slaughter, that the water was coming out in his water well and that Meadows made the remark that "it is sure going someplace."

Slaughter and Meadows disputed Hall's testimony and testified that on April 3 or 4, 1961, a metal shield was installed at the top of the four and one-half inch casing and that the shield was not removed until April 10 which was immediately before the hand-cementing operation which Slaughter's crew performed on the well on that day. Hall testified that no shield was in place when he was at the well on April 7, 1961. Denzil L. Prather, a witness in behalf of the defendants, testified that when he was at the well on April 7 there was nothing in the drill hole except the four and one-half inch production casing and that he could see no water standing in the hole. The plaintiff Hall also testified that he had a conversation with the defendant Slaughter before the well was drilled in which he asked Slaughter if he was going to drill the well and that Slaughter told him that he was; that Hall told Slaughter about his water well and that he would like for Slaughter to run some casing in the well; that water wells of the kind Hall had were hard "to come by"; and that Slaughter said that he would run an eight inch or a ten inch pipe in the well to give Hall some protection. Slaughter testified that the eight inch casing was left in the well until March 30, 1961, and that from the time it was installed until it was pulled it sealed off the fresh water encountered during the early drilling of the gas well. Slaughter also testified that before the Woofter well was drilled Hall asked Slaughter if he was going to drill the Woofter well, that Slaughter said that he was, that Hall asked Slaughter if Cohen was going to leave any pipe in the well and that Slaughter told Hall that Cohen "had not mentioned it."

On April 7, 1961, the well was fractured a second time by Dowell at which time fracturing operations were conducted in two sands, a stray sand at a depth of approximately 1590 feet and the Big Injun Sand at a depth of approximately 1315 feet and that substantially the same procedure was followed as that used when the well was first fractured on March 31, 1961. The fracture of the stray sand was commenced at 10:00 o'clock and completed at 10:31 o'clock during the forenoon and the fracture of the Big Injun Sand was

commenced at 3:30 o'clock and completed at 3:58 o'clock during the afternoon of April 7, 1961.

The operation of fracturing an oil or a gas well is a highly specialized type of work requiring a trained crew and special equipment. There is no showing that Dowell, which is generally recognized as competent and reliable in this kind of work and which had done some fracturing for the plaintiff James Hall on gas wells owned by him, departed from the standard and accepted procedure in use in the oil and gas industry in West Virginia or that Dowell was guilty of any negligence in connection with the fracturing operations. The perforation of the casing in connection with the fracturing operations was performed by Schlumberger Company and by Go-Electronics Company which are not parties to these actions, and the cementing of the well was performed by Halliburton Company, originally a defendant, which was dismissed from these actions without objection by any party.

The plaintiffs, the McCoys, have occupied their property since 1949 or 1950 and their water well, which is located about 450 feet from the gas well, was drilled in January 1950 to a depth of forty seven feet and contains twenty three feet six inches of casing. The water from this well was excellent and free from pollution before the early part of 1961. The McCoy property has been flooded at times by water from the West Fork River, which is about 500 feet from the property, but none of the flood water entered the well or contaminated its water. There are three septic tanks and three disposal areas on the property and the septic tank nearest the water well is about one hundred feet from it.

The plaintiff Guy McCoy testified that he noticed a change in the water from his well when he came home from work on the afternoon of March 31, 1961; that he arrived at his home at about 3:35 o'clock that afternoon and drank about a pint of water and that he noticed that it had "a kind of a puckerish taste" and he became ill the following morning; that the water had a rather offensive and peculiar odor and that it tasted like swamp water. After he detected this

change in the water in his well he learned that the water in the Hall and Arbogast wells was also polluted. He also testified that at times the water would "get good and then it would get bad."; that it contained sediment and that at the time of the trial at the March 1963 Term of court it still had an oily, repugnant taste and odor. He has not used the water for drinking purposes since March 1961 but has used it for other purposes. There is a small stream about 135 feet from his well which flows past a covered garbage dump on other property in the neighborhood of the gas well, and there is also an old oil well, which has been abandoned and plugged for several years, on other property and which is located about 700 feet from the McCoy residence.

The plaintiffs, the Halls, have occupied their property since the first week in April 1961. The construction of their residence began in October 1960 and was completed about March 20, 1961. The water well on their property, which is located about 270 feet from the gas well, was drilled in August 1960 to a depth of fifty eight feet and contains about twenty eight feet of casing, consisting of five inch galvanized pipe, and the Halls began to use the water from the well sometime before April 4, 1961. In drilling this well a large stream of water was encountered at a depth of thirty four feet. There is an abandoned garbage dump located on other property about 1000 feet from this well and there is also a septic tank on the Hall property. The plaintiff James Hall testified that until he noticed a change in the water about April 6, 1961, the water from his well was good, cool fresh water, which contained no odors or unusual taste, and its use did not irritate the skin. The change which he noticed was that on or about April 6 the water had a sour taste and contained an odor which Hall identified as frack fluid, and the water caused an irritation or burning sensation on the skin when used; and that after about six months the fracturing fluid odor in the water abated somewhat but at the time of the trial the water had a musty or swampy odor and contained sediment and a scum. In June 1961 he caused a second well to be drilled on his property to a total depth of 118 feet. In the drilling water was encountered at a depth of thirty two feet and contained "a little oil". Water was

again encountered at a depth of forty one feet and salt water at a depth of ninety five feet. At the depths of eighty and ninety three feet there was some gas in this well. The water, other than the salt water, had the same odor as that in the other well and it contained a thin film of crude oil. The second well was plugged at a point about sixty feet below the surface and at the time of the trial it continued to have the same kind of odor and an oily cast. The water in the second well, because of its odor and oily condition, has not been used by the Halls. Since the Halls discovered the pollution in the first well they have not used water from it for drinking or cooking purposes. The second well remains open to a depth of sixty feet and is not sealed at the top but is covered by loose boards placed across it. The second well is located at a distance of approximately 150 feet from the first well. Though the gas well does not produce gas in paying quantities, the production being only about 85,000 cubic feet, some gas from that well has been piped from it by the plaintiff James Hall for use in his home. That is the only substance which appears from the evidence to have escaped or emerged from the gas well since it was sealed.

The plaintiffs, the Arbogasts, have occupied their property since November 1960 and their water well, which is located about 450 feet from the gas well, was drilled in February 1960 to a depth of fifty five feet and this well contains twenty seven feet one inch of casing. The Arbogast property was flooded from the West Fork River in March 1963 to the extent of water three feet deep in the basement of the house and in that flood the water rose above the top of their water well. These plaintiffs testified that they noticed a change in the water in April 1961 and that before the change the water was good and was used for all purposes; that after the change it contained sediment, had a bitter taste, a bad odor and a film of oil; that it has a harmful effect on clothing and when used for washing roughens the hands; that it is not used for drinking or cooking purposes but it is used for all other purposes; and that at the time of the trial of this case at the March 1963 Term of the court, the odor was slightly less than it was at first but that the

oily substance was still present. There is a septic tank located seventy five to 100 feet from the water well.

Between the time that the pollution occurred in the water in the wells on the properties of the plaintiffs and the trial of the case several bacteriological and mineral analysis tests were made from samples of the water. The bacteriological tests for the different wells varied from time to time. A test of water from the first Hall well on April 16, 1961 was unsatisfactory. On April 26, 1961 a test of water from the McCoy well was satisfactory but on the same day a test of water from the Arbogast well was unsatisfactory. Test of the water from the McCoy well on October 3, 1961 was satisfactory but the same day a test of the water from the Arbogast and the Hall wells was unsatisfactory for each well; and a test of the water from the Hall well on November 7, 1961 was also unsatisfactory. On March 6, 1963, a test of the water from the McCoy well was unsatisfactory and disclosed a high coliform count. Mineral analysis tests made at the same time showed that the water in the Arbogast well was soft, that the water in the McCoy well was "right at the edge" of soft water, and that the water in the Hall well was medium hard water. The tests did not disclose the presence of frack water, or the presence of acid or detergents, or the presence of any appreciable amount of oily substance in any of the wells. The tests disclosed that the water in each well was alkaline instead of an acid type of water.

The defendant Slaughter, who drilled the gas well, testified that in the drilling of the bore hole of the well water was first encountered when the hole was from six to eight feet deep and that he believed this water to be surface water because of the bad weather conditions in February when the drilling began; that a larger quantity of water was encountered at a depth of about forty feet to forty five feet which he believed came from a small stream near the gas well; that a sizeable volume of water or a large stream was encountered at a depth of sixty five feet but that he did not know or have any reason to think that any of these waters was connected with any stream that led to any of the wells

of the plaintiffs. Slaughter also testified that no pipe was placed in the bore hole before the well was drilled to a depth of 200 feet; that the water in the hole was muddy, that it stood in the hole in a quantity approximately thirty five feet in depth for a period of about eighteen hours, and that if any of it had entered the wells of the plaintiffs the water in those wells would have been red water, and that such discoloration would have appeared in those wells.

The evidence shows that the drilling operations conducted by Slaughter and the fracturing operations performed by Dowell were performed in the usual and customary manner for such operations.

The plaintiffs assign as error (1) the action of the circuit court in directing verdicts in favor of the defendants, in overruling the motions of the plaintiffs to set aside such verdicts and to grant the plaintiffs new trials, and in rendering judgments in favor of the defendants on the ground that the plaintiffs failed to prove negligence on the part of any of the defendants which was the proximate cause of the injuries of which the plaintiffs complain; and (2) in sustaining the motions of the defendants to exclude evidence of permanent damages and in ruling that temporary damages were the proper measure of damages for the injuries to the real estate of the plaintiffs.

On the contrary the defendants insist that the defendants Slaughter and Dowell were independent contractors and not agents of the defendant Cohen and that none of the defendants was guilty of any negligence that was the proximate cause of the injuries of which the plaintiffs complain; and that if any damages resulted from the negligence of the defendants such damages are temporary and not permanent in character.

Though there is some conflict in the evidence as to whether the defendant Slaughter in any conversation with the plaintiff James Hall told Hall that he would protect the water wells or would leave the large casing in the gas well for that purpose, which Hall says Slaughter did but which Slaughter denies, and as to whether a shield was placed

over the top of the well to prevent frack fluid from entering the bore hole outside the four and one-half inch casing and whether any of such fluid did enter that area, most of the material facts disclosed by the evidence are undisputed.

Though it is competent to prove in an action based on negligence that the ordinary and customary manner in which an act was performed does not constitute negligence and though common usage is a test of negligence it is not a conclusive or controlling test; and if in the performance of work in the usual and customary manner a specific negligent act or omission occurs which constitutes the proximate cause of an injury proof that the work in general was performed in the ordinary and customary manner will not operate to excuse or prevent liability for the result of such negligence. See *Pinkney* v. *Kanawha Valley Bank*, 68 W. Va. 254, 69 S. E. 1012, 32 L.R.A., N.S., 987, Ann. Cas. 1912B, 115; *American Coal Company of Allegany County* v. *De Wese*, 30 F. 2d 349; and discussion in the opinion in *Schaffner* v. *National Supply Company*, 80 W. Va. 111, 92 S. E. 580.

The plaintiffs insists that the defendants were guilty of actionable negligence in the removal by the defendant Slaughter of the large outside casing from the gas well which if permitted to remain would have protected the water wells of the plaintiffs from the entry from the gas well of the foreign substances which caused the pollution of the water, in the action of Slaughter and the members of his crew in permitting frack fluid to escape and overflow from the gas well and to enter the annulus or portion of the bore hole of the well outside the four and one-half inch casing and to, enter and pollute the water in the wells of the plaintiffs, and in his alleged failure to place a proper shield at the top of the gas well to prevent the escape of such fluid.

It is clear from the evidence that neither the defendant Slaughter nor the defendant Dowell was an agent or an employee of the defendant Cohen but that each of them occupied the status of an independent contractor. The evidence shows that the defendant Cohen did not at any time possess or exercise the right of supervision of the work performed

by either the defendant Slaughter or the defendant Dowell but that the operation of drilling the well was supervised by the defendant Slaughter and the fracturing operations were under the supervision of the defendant Dowell. In consequence as the work performed and the acts committed by each of those defendants were not unlawful or intrinsically dangerous in character or did not constitute a nuisance, the defendant Cohen can not be held liable for any negligence upon the part of either of those defendants or their servants in the performance of the work. *Law* v. *Phillips,* 136 W. Va. 761, 68 S. E. 2d 452, 33 A.L.R. 2d 95; *Brewer* v. *Appalachian Constructors, Inc.,* 138 W. Va. 437, 76 S. E. 2d 916; *Rogers* v. *Boyers,* 114 W. Va. 107, 170 S. E. 905; *Trump* v. *Bluefield Water Works and Improvement Company,* 99 W. Va. 425, 129 S. E. 309; *Walton* v. *Cherokee Colliery Company,* 70 W. Va. 48, 73 S. E. 63; *Carrico* v. *West Virginia Cent. and P. Railway Company,* 39 W. Va. 86, 19 S. E. 571, 24 L.R.A. 50; *Wilson* v. *City of Wheeling,* 19 W. Va. 323, 42 Am. Rep. 780; *Atlantic and F. R. Co.* v. *Kimberly,* 87 Ga. 161, 13 S. E. 277, 27 Am. St. Rep. 231; *Mann* v. *Max,* 93 N. J. L. 191, 107 A. 417, 21 A.L.R. 1227; *Ohio Southern Railroad Company* v. *Morey,* 47 Ohio St. 207, 24 N. E. 269, 7 L.R.A. 701; 27 Am. Jur., Independent Contractors, Section 27; 57 C.J.S., Master and Servant, Section 584. "The test of the relation between one having work done and the workman consists in the employer's right or lack of right to supervise the work. If that right exists, the relation is that of master and servant. If that right does not exist, the relation is that of employer and independent contractor." Syllabus, *Greaser* v. *Appaline Oil Company,* 109 W. Va. 396, 155 S. E. 170; *Spencer* v. *The Travelers Insurance Company,* 148 W. Va. 111, 133 S. E. 2d 735; *Davis* v. *Fire Creek Fuel Company,* 144 W. Va. 537, 109 S. E. 2d 144; *Moore* v. *Burriss,* 132 W. Va. 757, 54 S. E. 2d 23; *Meyn* v. *Dulaney-Miller Auto Company,* 118 W. Va. 545, 191 S. E. 558; *Craft* v. *The Pocahontas Corporation,* 118 W. Va. 380, 190 S. E. 687; *Malcolm* v. *American Service Company,* 118 W. Va. 637, 191 S. E. 527; *Waldron* v. *Garland Pocahontas Coal Company,* 89 W. Va. 426, 109 S. E. 729; *Kirkhart* v. *United Fuel Gas Company,* 86 W. Va. 79, 102 S. E. 806; *Anderson* v. *Tug*

*River Coal and Coke Company,* 59 W. Va. 301, 53 S. E. 713; 35 Am. Jur., Master and Servant, Section 3.

Inasmuch as the defendant Cohen is not liable for any of the acts of the defendants Slaughter or Dowell in the performance of their work in connection with the drilling and the fracturing of the gas well and as he did not personally participate in any way in those operations, the plaintiffs have failed to establish any liability upon the part of the defendant Cohen in these consolidated actions and the action of the circuit court in directing a verdict and entering judgment in his favor was correct and proper.

The plaintiffs have also failed to prove any negligence upon the part of the defendant Dowell that was the proximate cause of the injuries to their water wells of which they complain. The undisputed evidence shows that the defendant Dowell performed its work in the ordinary and customary manner and that during the fracturing operations which it performed it did not permit the escape of any of the fracturing fluid used in those operations. The outside of the bore hole of the well was cemented for a distance of 700 feet from the bottom of the well to a point approximately 1050 feet from the surface and the fracturing operations extended through the four and one-half inch production casing and the outer cement in the sands at levels of approximately 1315 feet, 1590 feet and 1700 below the surface which were at least 1100 feet below the bottom level of the deepest water wells upon the properties of the plaintiffs. Under these established conditions it is clear, in the absence of any evidence to the contrary, that any substance inserted into any of the veins of sand at the levels of those depths could not have found its way upward and into any of the wells on the properties of the plaintiffs which, as already indicated, were more than 1100 feet above the fracturing operations conducted by the defendant Dowell.

Another significant and undisputed fact established by the evidence is that the plaintiff Guy McCoy first discovered the pollution of the water in his well, according to his positive testimony, at approximately 3:35 o'clock to 3:40 o'clock in the afternoon of March 31, 1961. The uncontradicted evi-

dence shows that the first fracturing operation conducted by the defendant Dowell did not begin until 4:00 o'clock in the afternoon of that day and that obviously that operation could not have caused the prior pollution to the well of the plaintiff Guy McCoy.

As the plaintiffs have failed to prove any negligence upon the part of the defendant Dowell that was the proximate cause of the injuries of which the plaintiffs complain, the circuit court was correct in directing a verdict and entering judgment in its favor in these consolidated actions.

The plaintiffs have likewise failed to prove any negligence upon the part of the defendant Slaughter that was the proximate cause of the damage to their water wells. Assuming that his conduct, with respect to the removal of the large casing and in permitting frack fluid to escape from the gas well into the annulus or the portion of the bore hole outside the four and one-half inch casing, constituted negligent acts or omissions, the plaintiffs have utterly failed to establish that any of those acts or omissions was the proximate cause of the injury to their wells. There is no showing that the oily substances and odors, to the existence of which the plaintiffs testified, came from the gas well. The evidence fails to show that any oil whatsoever was produced or escaped from that well, whereas there is evidence that oil was discovered in the drilling of the second water well on the Hall property which indicates that the oily film or substance in the water wells came from an entirely different source. The various mineral tests also show clearly that the foreign substance in the water wells of the plaintiffs was alkaline in character and not acidic as it would have been if any of the frack fluid, which was acidic in character, had entered those wells. The bacteriological tests, which at times were satisfactory and at other times were unsatisfactory with respect to each of the wells of the plaintiffs, show that bacteria came from a source other than the gas well for there is no evidence that any bacteriological substance was used or was present in the gas well at any time. In that situation the bacteria necessarily came from another source. It is also clear from the evidence that none of the water or none of the frack fluid which was

present in the bore hole of the well found its way from the hole to any of the wells of the plaintiffs. During the drilling of the gas well the bore hole contained muddy water at points above or level with or below the depths of the water wells of the plaintiffs and it is clear that none of the muddy water found its way into any of their wells for if it had done so, according to the undisputed testimony of Slaughter, its presence would have muddied and reddened the waters in those wells but there is no evidence to show that any muddy or reddish water was detected in them at any time. It is equally clear that if the muddy water from the bore hole did not enter any of the wells of the plaintiffs the relatively small quantity of frack fluid that may have escaped from the gas well likewise did not enter any of those wells. Moreover, the continued presence of the substances which polluted the water wells of the plaintiffs, as disclosed by the tests and the other evidence, until the trial of these consolidated cases nearly two years after the drilling of the gas well was completed, establishes clearly a persistent source of pollution which is separate and distinct from the gas well which was properly sealed on or about April 26, 1962, and the only substance which has since escaped or has been discharged from the gas well, mentioned in the evidence, is the gas piped from it for domestic use by the plaintiff James Hall.

Other significant facts disclosed by the evidence which indicate that the source of pollution is other than the gas well are the existence of an abandoned gas well located approximately 700 feet from the properties of the plaintiffs, periodic overflows from the waters of the West Fork River, an abandoned garbage dump, and septic tanks in use upon the properties of each of the plaintiffs. Though there is no direct evidence that any pollution has resulted from these sources they constitute at all times a potential pollution threat.

It is manifest from the evidence as a whole that the plaintiffs have failed to show that any of the substances which have polluted the water in their wells was used in or escaped and came from the gas well or were produced by the drill-

ing operations performed by any of the defendants in these consolidated cases. In consequence the action of the circuit court in directing a verdict and in entering judgment in behalf of each of the defendants, including the defendant Slaughter, was free from error.

A fundamental legal principle is that negligence to be actionable must be the proximate cause of the injury complained of and must be such as might have been reasonably expected to produce an injury. *Pygman v. Helton*, 148 W. Va. 281, 134 S. E. 2d 717; *Graham v. Wriston*, 146 W. Va. 484, 120 S. E. 2d 713; *Davis v. Fire Creek Fuel Company*, 144 W. Va. 537, 109 S. E. 2d 144; *Frye v. McCrory Stores Corporation*, 144 W. Va. 123, 107 S. E. 2d 378; *Miller v. Bolyard*, 142 W. Va. 580, 97 S. E. 2d 58; *Reece v. Hall*, 142 W. Va. 365, 95 S. E. 2d 648; *Puffer v. The Hub Cigar Store, Inc.*, 140 W. Va. 327, 84 S. E. 2d 145; *Hartley v. Crede*, 140 W. Va. 133, 82 S. E. 2d 672; *Keller v. Wonn*, 140 W. Va. 860, 87 S. E. 2d 453; *Matthews v. Cumberland and Allegheny Gas Company*, 138 W. Va. 639, 77 S. E. 2d 180; *State ex rel. Cox v. Sims*, 138 W. Va. 482, 77 S. E. 2d 151; *Wilson v. Edwards*, 138 W. Va. 613, 77 S. E. 2d 164; *McKinney v. Miller*, 138 W. Va. 324, 75 S. E. 2d 854; *Donald v. Long Branch Coal Company*, 86 W. Va. 249, 103 S. E. 55. Proximate cause is a vital and an essential element of actionable negligence and must be proved to warrant a recovery in an action based on negligence. *Pygman v. Helton*, 148 W. Va. 281, 134 S. E. 2d 717. One requisite of proximate cause is an act or an omission which a person of ordinary prudence could reasonably foresee might naturally or probably produce an injury, and the other requisite is that such act or omission did produce the injury. *Miller v. Bolyard*, 142 W. Va. 580, 97 S. E. 2d 58; *Matthews v. Cumberland and Allegheny Gas Company*, 138 W. Va. 639, 77 S. E. 2d 180; *State ex rel. Cox v. Sims*, 138 W. Va. 482, 77 S. E. 2d 151. In *Puffer v. The Hub Cigar Store, Inc.*, 140 W. Va. 327, 84 S. E. 2d 145, this Court quoted with approval this passage from the opinion in *Osborne v. Atlantic Ice and Coal Company*, 207 N. C. 545, 177 S. E. 796: "Foreseeable injury is a requisite of proximate cause, and proximate cause is a requisite for actionable negligence, and actionable

negligence is a requisite for recovery in an action for personal injury negligently inflicted."

As the plaintiffs have failed to prove that the injury to their water wells, for which they seek to recover damages in these consolidated actions, was proximately caused by any negligent acts or omissions of any of the defendants the action of the circuit court in directing a verdict in favor of each of the defendants was correct and proper for the reason that if a verdict in favor of any of the plaintiffs had been rendered by the jury it would have been necessary for the court to set it aside. As previously indicated the evidence in this case, though in some respects conflicting, embraced uncontradicted facts and circumstances which caused the case to turn in favor of the defendants. This Court has consistently held that when the evidence, though conflicting as a whole, embraces uncontradicted facts and circumstances which cause the case to turn in favor of one of the parties, so that a verdict adverse to such party can not stand, the court should direct a verdict in his favor. *Lightner* v. *Lightner*, 146 W. Va. 1024, 124 S. E. 2d 355; *Campbell* v. *Campbell*, 146 W. Va. 1002, 124 S. E. 2d 345; *Preston County Coke Company* v. *Preston County Light and Power Company*, 146 W. Va. 231, 119 S. E. 2d 420; *Mulroy* v. *Co-Operative Transit Company*, 142 W. Va. 165, 95 S. E. 2d 63; *Adkins* v. *Aetna Life Insurance Company*, 130 W. Va. 362, 43 S. E. 2d 372; *Norvell* v. *Kanawha and Michigan Railway Company*, 67 W. Va. 467, 68 S. E. 288, 29 L.R.A., N.S., 325.

Inasmuch as the plaintiffs have failed to establish liability upon the part of any of the defendants, it is unnecessary to consider or determine whether the damages, which the plaintiffs would have been entitled to if liability of the defendants had been established, would be temporary or permanent in character.

As the plaintiffs have failed to establish that any of the defendants was guilty of negligence which was the proximate cause of the injuries of which the plaintiffs complain, the judgments of the Circuit Court of Lewis County rendered upon directed verdicts in favor of the defendants, being free from error, are affirmed.

*Affirmed.*